1  ROBERT A. KRAUSE (*Pro Hac Vice*)
   ELIZABETH A. RICHARDS (*Pro Hac Vice*)
2  THE SPENCE LAW FIRM
   15 South Jackson Street
3  Jackson, Wyoming 83001
   Tel.: (307) 733-7290
4  Fax: (307) 733-5248
   krause@spencelawyers.com
5  richards@spencelawyers.com

6  MARK P. ROBINSON, JR. (State Bar No. 054426)
   KEVIN F. CALCAGNIE (State Bar No. 108994)
7  DANIEL S. ROBINSON (State Bar No. 244245)
   SCOT D. WILSON (State Bar No. 223367)
8  ROBINSON, CALCAGNIE & ROBINSON
   620 Newport Center Drive, Suite 700
9  Newport Beach, California   92660
   Tel.: (949) 720-1288
10 Fax: (949) 720-1292
   mrobinson@rcrlaw.net
11 kcalcagnie@rcrlaw.net
   drobinson@rcrlaw.net
12 swilson@rcrlaw.net

13 Attorneys for Plaintiffs

14

15                   UNITED STATES DISTRICT COURT

16                   CENTRAL DISTRICT OF CALIFORNIA

17 SHIRLENE VAN ALFEN, TRAVIS VAN        Case No.    **CV11-4143 CAS(AGRx)**
   ALFEN, CAMERON VAN ALFEN, and
18 CASEY VAN ALFEN, individually and as   **COMPLAINT FOR DAMAGES**
   the heirs and successors in interest to
19 PAUL VAN ALFEN, deceased; MARK        **1.  Fraudulent Concealment**
   ROUNDY, as Personal Representative of  **2.  Products Liability: Design Defect**
20 the Estate of CHARLENE LLOYD;          **3.  Products Liability: Failure to Warn**
   CHARLEY ALTON JONES, SANDRA           **4.  Negligence**
21 JOLENE JONES, and MAKENNA             **5.  Breach of Warranty**
   LLOYD, individually and as the heirs and **6.  Magnuson Moss Warranty Act, 15**
22 successors in interest to CHARLENE        **U.S.C. § 2301 *et seq.***
   LLOYD, deceased,                       **7.  Negligent Infliction of Emotional**
23                                           **Distress**
                   Plaintiffs,            **8.  Wrongful Death**
24                                         **9.  Survival**
            vs.
25                                        **DEMAND FOR JURY TRIAL**

26

27

28

TOYOTA MOTOR SALES, U.S.A., INC.,
a California corporation; TOYOTA
MOTOR CORPORATION, a foreign
corporation; TOYOTA MOTOR NORTH
AMERICA, INC., a California
corporation; TONY DIVINO TOYOTA, a
Utah corporation, and TOYOTA MOTOR
ENGINEERING & MANUFACTURING
NORTH AMERICA, INC., a Kentucky
corporation.

Defendants.

# TABLE OF CONTENTS

PAGE

I.   INTRODUCTION.................................................................1

II.   JURISDICTION AND VENUE .............................................5

III.   PARTIES.......................................................................5

IV.   FACTUAL BACKGROUND ..............................................7

V.   COMMON ALLEGATIONS ...............................................9

    A.   Summary of the Defects ...............................................9

    B.   Timeline of Key Events regarding Toyota Vehicles ...................10

        i.   Toyota's ETCS-i System..........................................10

        ii.   NHTSA Investigates UA in Toyota Vehicles in the
           Midst of Toyota's Climb to #1 Vehicle Manufacturer
           in the United States...............................................12

    C.   Toyota Sacrificed Quality while Maintaining Image of Safety
        and Reliability...................................................21

VI.   FRAUDULENT CONCEALMENT, TOLLING AND ESTOPPEL ....................22

VII.   FIRST CAUSE OF ACTION ..............................................58

VIII.   SECOND CAUSE OF ACTION ..........................................60

IX.   THIRD CAUSE OF ACTION ..............................................61

X.   FOURTH CAUSE OF ACTION ...........................................62

XI.   FIFTH CAUSE OF ACTION ..............................................64

XII.   SIXTH CAUSE OF ACTION..............................................65

XIII.   SEVENTH CAUSE OF ACTION.........................................67

XIV.   EIGHTH CAUSE OF ACTION...........................................67

XV.   NINTH CAUSE OF ACTION ..............................................68

PRAYER FOR RELIEF ............................................................72

DEMAND FOR TRIAL BY JURY ................................................74

i

1    Plaintiffs SHIRLENE VAN ALFEN, TRAVIS VAN ALFEN, CAMERON VAN

2   ALFEN, and CASEY VAN ALFEN, individually and as the heirs and as successors in

3   interest to Paul Van Alfen, deceased; SHIRLENE VAN ALFEN  and  CAMERON

4   VAN ALFEN; and MARK ROUNDY,  as Personal Representative of the Estate of

5   CHARLENE LLOYD on behalf of the heirs and successors in interest to CHARLENE

6   LLOYD, CHARLEY ALTON JONES, SANDRA JOLENE JONES, and MAKENNA

7   LLOYD (hereinafter "Plaintiffs"), bring this complaint herein against Toyota Motor

8   Sales, U.S.A., Inc. ("TMS"), Toyota Motor Corporation ("TMC"), Toyota Motor North

9   America, Inc. ("TMNA") Toyota Motor Engineering & Manufacturing North America,

10   Inc. ("TEMA") (collectively as "Toyota" and/or the "Toyota Defendants"), and Tony

11   Divino Toyota (the "Dealer" and/or "Dealer Defendant"); (altogether "Defendants"),

12   and allege as follows:

## I.    INTRODUCTION

13

14    1.    Toyota misleadingly promised safety and trust, while at the same time

15   purposely concealed evidence of electronic defects in its vehicles from the American

16   public, and hid its own knowledge of an alarming number of incidents of unintended

17   accelerations, deaths and injuries.

18    2.    Despite the feasibility and availability of a "brake override system"

19   whereby driver brake application will immediately stop any unintended acceleration

20   ("UA"), and despite the fact that Toyota's internal documents show that Toyota was

21   aware that UA incidents were occurring and presented an unreasonable risk of serious

22   injury or death, Toyota recklessly failed to install brake overrides in its vehicles.

23    3.    Even in late 2009 and early 2010 when Toyota announced recalls

24   involving a brake override system, Toyota purposely hid the fact that this redesign was

25   safety-related and critical to preventing UA.  Instead, Toyota claimed that the brake

26   override system was being added as an "extra measure of confidence" for Toyota

27   owners.

28   / / /

1

4.     When pressed to explain and implement solutions to UA, Toyota issued recalls to address alleged mechanical issues, such as defective floor mats and sticky accelerator pedals.

5.     While these problems undoubtedly posed real dangers for some drivers, a far greater number of vehicles were affected by the ETCS design defects described herein. Indeed, the "sticky pedal" and "floor mat" recalls have failed to adequately address the UA problem. Drivers continue to report UA incidents in vehicles that were not part of the recalls. Likewise, even among vehicles that were recalled and repaired, drivers continue to report experiences of UA.

6.     Toyota effectively used these "floor mat" and "sticky pedal" problems to downplay and divert attention away from the major design defects and safety problems with the ETCS, including the need for a brake override system. Rather than revealing the truth about its UA electronic/software/hardware defects, Toyota highlighted and promoted the floor mat and pedal recalls as a "smoke screen," while at the same time misleadingly characterizing the "reflashing" of the computer software to allow for brake override as merely a "confidence" boost.

7.     The absence of a brake override system by itself renders the vehicles defective and unreasonably dangerous, and the vehicles do not perform as safely as an ordinary consumer would expect, but the danger is magnified even more by the susceptibility of Toyota vehicles and their electronic throttle control systems to electronic-related and/or mechanical-related computer/software/hardware glitches.

8.     In an effort to keep the electronic issue from going public, Toyota actually hired several NHTSA employees with very strong relationships with their previous co-employees at NHTSA. Two such employees are Christopher Tinto and Christopher Santucci. Toyota internal documents reveal that over the past eight years, relevant information and categories of unintended acceleration incidents were excluded from Toyota's reporting and/or warning of these events to the consuming public.

/ / /

2

9.     From 1998 through 2010 Toyota continuously and consistently promised safety for their Toyota/Lexus/Scion vehicles, and repeatedly promised a brand of "trust" to prospective purchasers of their vehicles. From 2002 to 2010 Toyota continuously denied any problems with their throttle control systems on their vehicles, while during that same time period 2010 Toyota received thousands of reports of unintended acceleration, surging and/or speed control problems with Toyota/Lexus/Scion vehicles.

10.     In fact, Toyota was forced to disclose to Congress 37,900 complaints of such reported events.

11.     From 2002 to 2010 Toyota knew and/or should have known that the state of the art in the automotive industry for electronic throttle control systems included the installation of a brake override system.  Toyota's own documents show that Toyota knew that unintended acceleration events were preventable by installing a brake override system in their vehicles.  With a brake override system, when an unintended acceleration event begins to occur, drivers can override the acceleration or surging by placing their foot on the brake.

12.     Toyota manager Koji Sakakibara stated in a document dated September 1, 2009, that "during the floormat sticking issue in 2007 TMS suggested that there should be failsafe option similar to that used by other companies to prevent unintended acceleration." In fact, "Mr M. said this kind of system will be investigated by Toyota, not by body engineering division.... Information concerning the sequential inclusion of a failsafe system would be given by Toyota to NHTSA when Toyota was invited in 2008." (*See* Exhibit 1, TOY-MDLID00041130T-0001)

13.     Instead of installing a brake override system earlier, Toyota waited until the media and the public heard about the August 2009 unintended acceleration crash in San Diego involving a Lexus vehicle, which killed a CHP officer and three other family members.

/ / /

COMPLAINT FOR DAMAGES

14.     Even in late 2009 and early 2010 when Toyota announced a recall involving a brake override, Toyota purposely hid the fact that this redesign was safety related.   Instead, Toyota deceptively labelled their recalls "floor mat" and "sticky pedal" recalls with a "throw-in" at the end of the recall about an "override" reflash of the software in the recalled vehicles for consumer confidence purposes.

15.     An inventory of statements from Toyota leadership at the highest levels clearly shows that Toyota knows and has known its vehicles present an extreme danger, in that they are subject to unintended acceleration as a result of defects in their design and manufacture, and confirms that Toyota designed and manufactured defective vehicles and also that Toyota has acted carelessly and in conscious disregard for the safety of the public in addressing this grave danger presented by the defects in their vehicles:

- Koji Sakakibara, the TEMA manager, knew in 2007 of the need for a brake override;

- Toyota Motor Corporation's CEO, Akio Toyoda, acknowledged that Toyota had grown "too quick";

- Toyota Motor Sales President, James Lentz, admitted that the floor mat pedal recall does "not totally solve" the unintended acceleration problem;

- Toyota North America's President, Yoshimi Inaba, conceded that "Toyota has not lived up to its high standards"; and

- Toyota Motor Corporation's Executive Vice President, Shinichi Sasaki concluded that Toyota did not listen to "many voices" of unintended acceleration.

16.     Toyota promised trust and safety, but delivered neither.   Rather than recalling the problematic vehicles and implementing a feasible and readily available brake override system, Toyota hid the problem and proposed inadequate and misleading solutions.   Toyota's actions have resulted in preventable UA incidents, leading to numerous fatalities and injuries, including those suffered by Plaintiffs.

4

## II.   JURISDICTION AND VENUE

17.   This Court has federal question jurisdiction in this civil action pursuant to 28 U.S.C. § 1331.

18.   This Court has subject matter jurisdiction over claims specified in this Complaint pursuant to 15 U.S.C. § 2310(d). The amount in controversy exceeds $50,000.00 for the causes of action alleged herein.

19.   Additionally, this Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

20.   Venue is proper in this District under 28 U.S.C. § 1391(a)(2) and 28 U.S.C. § 1391 (b)(2). A substantial part of the events or omissions giving rise to the claims occurred and/or emanated from this District. One or more of the Defendants also reside in this judicial district. This is also the District where the MDL actions are pending. Venue is also appropriate in this District because it is the most convenient forum for this action.

## III.   PARTIES

21.   Prior to his death, Paul Van Alfen was a resident of the State of Utah.

22.   Plaintiff Shirlene Van Alfen was the spouse of Decedent Paul Van Alfen. Plaintiff Shirlene Van Alfen was, at all times relevant herein, a resident of the State of Utah.

23.   Plaintiffs Travis Van Alfen, Cameron Van Alfen, and Casey Van Alfen are the sons of Decedent Paul Van Alfen, and are, at all times relevant herein, residents of the State of Utah.

24.   Prior to her death, Charlene Lloyd was a resident of the State of Utah.

25.   Plaintiff Charley Alton Jones was the father of Decedent Charlene Lloyd. Plaintiff Charley Alton Jones was, at all times relevant herein, a resident of the State of Utah.

/ / /

/ / /

5

26.     Plaintiff Sandra Jolene Jones was the mother of Decedent Charlene Lloyd. Plaintiff Sandra Jolene Jones was, at all times relevant herein, a resident of the State of Utah.

27.     Plaintiff MaKenna Lloyd was the daughter of Decedent Charlene Lloyd. Plaintiff MaKenna Lloyd was, at all times relevant herein, a resident of the State of Utah.

28.     Plaintiff Mark Roundy, the brother of Charlene Lloyd, deceased, is Personal Representative of the Estate of Charlene Lloyd, and is, at all times relevant herein has been, a resident of the State of Utah.

29.     Defendant Toyota Motor Sales, U.S.A., Inc. ("TMS") was and is a California corporation authorized to do business under the laws of the State of California, and, at all times herein mentioned, was and is engaged in the business of promoting and selling Toyota automobiles within the County of Orange, State of California, with its principal place of business located at 19001 South Western Avenue, in the City of Torrance, County of Los Angeles.

30.     Defendant Toyota Motor Corporation ("TMC") is a Japanese corporation with its principal place of business located at 1 Toyota-Cho, Toyota City, Aichi Prefecture, 471-3571, Japan. At all times herein mentioned, defendant Toyota Motor Corporation was and is authorized to do business within the State of California, and was and is engaged in the business of deriving profit from designing, manufacturing, warning, advertising, promoting and importing Toyota automobiles for sale within the County of Orange, State of California.

31.     Defendant Toyota Motor North America, Inc. ("TMA") was and is a California corporation authorized to do business under the laws of the State of California, and, at all times herein mentioned, was and is engaged in the business of promoting and selling Toyota automobiles within the County of Orange, State of California, with its principal place of business located at 19001 South Western Avenue, in the City of Torrance, County of Los Angeles.

6

32.     Defendant Tony Divino Toyota (the "Dealer") is a Utah corporation and Toyota dealership engaged in the business of selling and leasing Toyota vehicles with its principal place of business located at 777 West River Road, Riverdale, Utah 84405. The Dealer serviced the subject Toyota vehicle involved in the incident in this case.

33.     Defendant Toyota Motor Engineering & Manufacturing North America, Inc. ("TEMA") is a Kentucky corporation authorized to do business under the laws of the State of California, and at all times herein mentioned, was and is engaged in the business of promoting and selling Toyota automobiles within the County of Orange, State of California, with its principal place of business located at 25 Atlantic Avenue, in the City of Erlanger, in the State of Kentucky.

34.     Defendants TMS, TMC, TMA, and TEMA will be referred to herein collectively as "Toyota" or, along with the Dealer, as "Defendants."

35.     Plaintiffs are informed and believe, and thereupon allege, that at all times relevant and mentioned herein, Defendants, and each of them, were at all times material hereto acting within the authorized course, scope and purpose of said agency and employment and that all of said acts were subsequently performed with the knowledge, acquiescence, ratification and consent of the respective principals, and the benefits thereof accepted by said principals.

## IV.     FACTUAL BACKGROUND

36.     On November 5, 2010, Decedent Paul Van Alfen was driving a 2008 Toyota Camry (the "Toyota vehicle") near Wendover, Utah.  Plaintiff Shirlene Van Alfen was seated in the right front passenger seat of the Toyota vehicle.  Plaintiff Cameron Van Alfen was seated in the right rear passenger seat of the Toyota vehicle. Decedent Charlene Lloyd was seated in the left rear passenger seat of the Toyota vehicle.

37.     The Subject Camry owned and operated by Van Alfen was designed, manufactured, equipped, warranted, promoted, advertised, warned, distributed and sold by Toyota.

7

38.     Immediately prior to the accident, Van Alfen attempted to exit Interstate 80 near Wendover.  As Van Alfen pulled on the exit ramp and despite operating his vehicle in a foreseeable and intended manner, the Subject Camry suddenly and unexpectedly accelerated and did not respond to attempts to brake and slow the vehicle. Despite Van Alfen's efforts to slow and stop the vehicle by application of the brakes, the braking system of the Subject Camry failed to operate as intended, and failed to adequately slow or stop the Subject Camry prior to impact.  As a result, the vehicle accelerated through a stop sign and slammed into a wall opposite the exit ramp.

39.     Paul Van Alfen died at the scene as a result of injuries sustained in the crash.

40.     Charlene Lloyd died at the hospital on November 6, 2010, the following day after the incident.

41.     Plaintiffs Shirlene Van Alfen and Cameron Van Alfen sustained personal injuries in the crash.

42.     The aforesaid events and resulting injuries and damages to Plaintiff were caused by the Subject Camry, including its design, failure to warn, manufacture, marketing, service, inspection, distribution, and sale.  At no time prior to the Subject Camry's sudden and unexpected acceleration on November 5, 2010 did Toyota provide any warning regarding the dangerous propensities within the Subject Camry.  At no time prior to the Subject Camry's sudden and unexpected acceleration on November 5, 2010, did the Subject Camry include a brake override system or fail-safe device to impede or stop the sudden, unexpected acceleration of the Subject Camry, although such a feasible alternate design was available and had been used by other prominent manufacturers.

///

///

///

///

8

## V.   COMMON ALLEGATIONS

### A.   Summary of the Defects.

43.   Since 1998, Toyota has manufactured and sold millions of vehicles (under the Toyota, Lexus, and Scion brand names) throughout the United States and worldwide that use an electronic throttle control system ("ETCS" or "ETCS-i").

44.   Vehicles with ETCS manufactured, marketed, sold and/or distributed by Toyota and its affiliated companies suffer from the same overarching defect, in that, they are vulnerable to UA incidents, including surges, lurching, revving engines, and other instances of unintended acceleration captured as part of the thousands of complaints to NHTSA and the more than 37,900 complaints received by Toyota. Regardless of the many root causes, an effective brake-override system would serve as a fail-safe design feature to prevent and/or minimize the risk of injury, harm or damage to Toyota vehicle owners or their occupants from UA events.

45.   In addition to the lack of an effective brake-override system, there are other defects in the Vehicles that cause and/or contribute to the overarching defect of UA, including, but not limited to, defective pedals and poorly designed floor mats, and there are design defects in Toyota vehicles that caused, contributed to, and/or failed to prevent UA events, including the following: (1) an inadequate fault detection system that is not robust enough to anticipate foreseeable unwanted outcomes, including UA; (2) the ETCS and its components are highly susceptible to malfunction caused by various electronic failures, including, but not limited to, short circuits, software glitches, and electromagnetic interference from sources outside the vehicle; and (3) there was a failure to warn consumers as to how to properly push and hold buttons or shift into neutral in order to stop UA events once the aforementioned defects had set the UA events in motion.

/ / /

/ / /

/ / /

9

1    **B.    Timeline of Key Events regarding Toyota Vehicles.**

2        46.    Toyota has been receiving evidence for many years, from a variety of

3    sources, which established there are serious safety defects in its vehicles, including an

4    alarming increase in the number of complaints, injuries, and deaths, which Toyota

5    knew or should have known were likely caused by said defects.

6        **i.    Toyota's ETCS-i System.**

7        47.    In the late 1990's, Toyota began to replace its mechanical throttle linkage

8    with a computer-controlled accelerator system or fly-by-wire system.   Eventually,

9    Toyota discontinued the mechanical linkage in throttle systems and changed to a

10   computer-controlled accelerator system.

11       48.    Toyota calls its electronic throttle control system the ETCS-intelligent, or

12   ETCS-i. ETCS-i activates the throttle utilizing the command from the driver's foot that

13   is conveyed electronically from two position sensors in the accelerator pedal, processed

14   in the engine control computer and then transmitted to the throttle. Toyota began

15   installing ETCS-i in models of the 1998 Lexus. This ETCS included a mechanical link

16   that shut off the throttle.

17       49.    Toyota's earlier ETCS-i equipped vehicles retained a mechanical system

18   that would close the throttle if the electronic system failed. However, Toyota had

19   phased out these mechanical linkages by the time it incorporated ETCS-i into the 2002

20   Camry. Toyota knew other manufacturers continued to use a manual fail-safe

21   mechanism. For example, Toyota knew Audi had a system that mechanically closed the

22   throttle when the brakes were applied.

23       50.    Toyota's ETCS-i also does not contain a key safety feature included in the

24   Bosch state-of the art system.   The Bosch ETCS requires that a spring test be

25   conducted on the spring contained within the throttle unit.  The spring test ensures that

26   the spring remains in working order by confirming the internal return of the spring with

27   every ignition cycle.  Toyota's ETCS-i does not employ a similar spring test.

28

COMPLAINT FOR DAMAGES

51.     In order to address potential malfunctions of the ETCS-i – in other words, instances where the control strategy of the vehicle has become compromised – all ETCS employ the same four fail-safe strategies. The fail-safe strategies are:

      a.     If the engine throttle plate is physically stuck in a position different from that corresponding to the accelerator position, or the engine control computer fails, the engine's fuel supply should cut off and result in an engine stall;

      b.     The "single-point" failure of one accelerator pedal position sensor is intended to result in a 70% to 75% reduction in throttle capacity;

      c.     The "double-point" failure of both accelerator pedal position sensors should close the throttle to idle; and

      d.     If one or both throttle position sensors fail, or the throttle itself is not responding properly to the accelerator pedal but the throttle itself is not physically stuck, the throttle should close but will provide minimal acceleration.

52.     Toyota knew no later than 2002 that these fail-safes were insufficient to prevent UA events in its vehicles and that additional fail-safes were necessary. Toyota did not, however, move to address these issues by installing additional fail-safes.

53.     Toyota had several options. For example, Toyota could have installed a software subroutine that cuts the throttle when the brake pedal is depressed, which would mitigate many of the failure mechanisms causing UA. Or, Toyota could have employed a hardware-redundant, fault tolerant solution (BMW's approach). Or, Toyota could have provided an override of the engine control module, such as a key switch to physically remove the power to the Engine Control Module ("ECM"). Or, Toyota could have installed a multiple-redundant cross-check ECM or a bus traffic cross-check system. Toyota did none of these things.

/ / /

COMPLAINT FOR DAMAGES

ii.   **NHTSA Investigates UA in Toyota Vehicles in the Midst Toyota's Climb to #1 Vehicle Manufacturer in the United States**

54.   In 2003, Toyota sold 6,780,000 vehicles and overtook Ford Motor Company in annual sales to become second in the United States behind only General Motors.

55.   In February 2003, NHTSA conducted its first of many investigations regarding speed control problems in Toyota vehicles.  The first two involved the Camry and Solara models.

56.   In April 2003, Toyota dealt internally with an "unwanted acceleration" incident during production testing of the Sienna model.  Toyota blamed a "faulty trim panel clip," deemed it an isolated incident, and did not make such information available to NHTSA until 5 years later in response to a blanket information request by the agency.

57.   In July 2003, NHTSA opened the first probe of UA complaints in Lexus sedans at the request of an owner.

58.   In March 2004, NHTSA opened a wider probe into Lexus sedans after another complaint regarding sudden acceleration.  NHTSA notified Toyota that it was opening an investigation of unwanted acceleration and vehicle surge in 2002-2003 Camry and Solara models.  Toyota succeeded in narrowing the investigation to 11 incidents involving 5 crashes.

59.   In July 2004, NHTSA closed its investigation of the Lexus sudden acceleration complaints without finding a defect.  Citing a lack of resources, NHTSA turned down two more requests from consumers to investigate the problem.

60.   In 2005, the auto part supplier CTS began making pedal assemblies for Toyota.

61.   In August 2005, NHTSA conducted an evaluation of the Camry after reports of some "inappropriate and uncontrollable vehicle accelerations."

///

12

62.   In November 2005, Toyota wrote NHTSA and stated that a dealership-led review of 59 owner claims regarding their Toyotas found "no evidence of a system or component failure" and stated that the "vehicles operated as designed."

63.   In 2006, Toyota passed General Motors as the number one brand of cars sold in the United States, with 8,800,000 vehicles sold.

64.   In January 2006, NHTSA opened a second investigation of Toyota Camry models and received questionnaires from Camry owners, who reported hundreds of problems with acceleration and braking.  After communicating with Toyota, NHTSA closed the investigation without finding a defect and stated the claims were of "ambiguous significance."

65.   In August 2006, NHTSA continued to receive more complaints about accelerator problems with the 2002-2006 Camry models.

66.   In September 2006, NHTSA opened a third investigation into reported "engine surging" incidents with Toyota vehicles.  Toyota represented to NHTSA that there was no abnormality in the throttle control system and blamed water damage. NHTSA closed this investigation without finding a defect, citing "the need to best allocate limited administrative resources."

67.   In March 2007, NHTSA launched a probe into the floor mats of Lexus models.  Toyota responded by claiming the "issue is not a safety concern."  NHTSA also preliminarily reviewed the 2007 Lexus ES for unwanted acceleration due to floor mat interference, but closed the investigation seven months later.

68.   In August 2007, NHTSA upgraded its investigation to "engineering analysis," which means the agency would test Toyota vehicles rather than merely review complaints.

69.   In September 2007, Toyota recalled 55,000 Camry and Lexus models under pressure from NHTSA due to suspected floor mats that purportedly interfered with the accelerator pedal.

/ / /

13

70.    In January 2008, NHTSA launched a probe into sudden unintended acceleration with Tacoma pickups after receiving notice of potentially 478 incidents with 2004-2008 models.  In response, Toyota told NHTSA they could not find enough evidence to support allegations and that an investigation was not warranted.

71.    In August 2008, NHTSA closed its investigation of the Tacoma without finding a defect, despite hundreds of complaints.  This was the eighth investigation of Toyota vehicles since 2003.  As of that time, there were over 2,600 complaints made regarding "run away" Toyota vehicles.

72.    In February 2009, Toyota continued to deny that there was any defect in the ETCS, even when independent professional engineers concluded that a UA incident in Tennessee was caused by deviations with the vehicle's ETCS.

73.    In April 2009, NHTSA received another petition for an investigation of throttle-control problems in Toyota vehicles unrelated to floor mat issues.

74.    On August 28, 2009, California Highway Patrol officer Mark Saylor and his family were killed when his Toyota vehicle (Lexus ES350) accelerated out of control to over 100 mph.  A 911 call by a passenger said the car had "no brakes."

75.    In September 2009, NHTSA told Toyota to expect wider recalls of floor mats.  Toyota warned consumers to remove floor mats because of a supposed potential to jam the accelerator, purportedly causing sudden unintended acceleration.

76.    In October 2009:

- Toyota received reports in the United States and Canada that pedals were sticking in certain models.
- Toyota then issued a floor mat recall on 4.2 million Toyota and Lexus vehicles, advising consumers to remove floor mats and place them in the trunk, and directing dealers to use zip ties to secure floor mats to avoid gas pedal interference.

/ / /

/ / /

14

COMPLAINT FOR DAMAGES

- Akio Toyoda, president of the Japanese parent corporation, issued a public apology to the Saylor family and every customer affected by the recall, admitting: "Customers bought our cars because they thought they were the safest but now we have given them cause for grave concern. I can't begin to express my remorse."

- The Los Angeles Times published the first of many stories concerning claims of sudden unintended acceleration in Toyota vehicles, including nine NHTSA investigations that included five deaths and hundreds of complaints filed with the federal government. Toyota then sent letters to consumers regarding the unintended acceleration issue, claiming "no defect exists."

77.   In November 2009:

- Toyota expanded the floor mat recall by over a million vehicles.

- NHTSA publicly rebuked Toyota, calling Toyota's press release "inaccurate" and "misleading," noting that the floor mat recall was an "interim" measure and that it "does not correct the underlying defect."

- Toyota then publicly apologized for its inaccurate press release.

- Toyota issued another press release denying media reports that a problem existed with the electronic throttle system.

- The Los Angeles Times wrote another article stating that Toyota ignored over 1,200 complaints of sudden unintended acceleration over the preceding eight years.

- Toyota announced a preliminary fix for the "floor mat problem" by cutting off part of the gas pedal and expanded the total number of Toyota vehicles subject to recall to 4.2 million.

- Toyota instructed dealers to remove the gas pedal and shorten it so it would not interfere with floor mats.

78.   In December 2009:

COMPLAINT FOR DAMAGES

- NHTSA opened an investigation into whether the electronic control modules in Corolla and Camry models caused them to stall without warning.
- NHTSA opened an investigation into the 2003 Sequoia SUV model for problems with the computerized vehicle stability control system.

79.   In January 2010:

- Toyota announced a brake override software "fix" would be applied to its vehicles globally by 2011.
- Toyota told NHTSA it may have "an issue" with sticking accelerator pedals.
- NHTSA told Toyota it must conduct a recall.
- Toyota issued a recall for sticking accelerator pedals affecting 2.3 million vehicles.
- Toyota then expanded the pedal recall to include another 1.1 million vehicles.
- United States Transportation Secretary Ray LaHood told a Chicago radio station that the government had asked Toyota to stop selling recalled vehicles.
- Toyota told NHTSA it had a fix for the sticky-pedal problem, as well as a permanent fix for the mat problem.

80.   On January 26, 2010, after ever-increasing adverse publicity, Toyota stopped selling its recalled models, stating that preventing the sale of the vehicles was "necessary until a remedy is finalized." Then, approximately a week later, Toyota completely reversed course and began selling the defective vehicles.

81.   In February 2010:

- Transportation Secretary Ray LaHood testified before a Congressional panel cautioning drivers to seek repairs for sticking accelerators.

COMPLAINT FOR DAMAGES

- Kelly Blue Book said affected Toyota models were devalued as much as 5%.
- Edmunds stated the average devaluation was between 4%-8%.
- Toyota admitted to a brake software problem in 2010 Prius Hybrids.
- Toyota recalled the 2010 Prius, Lexus HS 250h and Camry Hybrids due to faulty brakes (437,000 vehicles worldwide).

82.    Akio Toyoda, President and CEO of Toyota Motor Corporation, in his prepared testimony before the Committee on Oversight and Government Reform of the U.S. House of Representatives on February 24, 2010, admitted that Toyota's growth in recent years was "too quick" and the company's priorities of "first, safety; second, quality; third, volume" had become "confused."  Mr. Toyoda went on to apologize to American consumers, "I regret that this has resulted in the safety issues described in the recalls we face today, and I am deeply sorry for any accidents that Toyota drivers have experienced."

83.    On March 4, 2010, United States Representatives Henry Waxman and Bart Stupak wrote in a letter to Toyota: "We do not understand the basis for Toyota's repeated assertions that it is 'confident' there are no electronic defects contributing to incidents of sudden unintended acceleration . . . There's a Glitch . . . You really don't know when it's going to occur and that's the uncertainty which should cause safety concerns."

84.    On March 5, 2010, new data released showed that more than 60 drivers have complained of sudden unintended acceleration incidents despite the fact that their cars were repaired by Toyota Motor Corp. in the current recalls.  The figures released by NHTSA significantly increased the total number of complaints involving repaired vehicles.  The new complaints alleged several accidents and at least three injuries resulting from runaway unintended acceleration despite the vehicles' modifications at Toyota dealerships designed to resolve the issue.

/ / /

17

85.   As of March 6, 2010, the number of deaths attributed to possible sudden unintended acceleration in Toyota cars had risen to 58.  The Detroit Free Press reported that the number of complaints to U.S. auto safety regulators related to sudden unintended acceleration also had grown to 3,300.

86.   Analyses of publicly available databases by other researchers indicate that from 1999 to the present there have been more than 5,800 UA incidents involving Toyotas that have resulted in 2,166 crashes, 1,011 injuries and 78 deaths. Internally, Toyota was tallying the deaths caused by UA.

87.   As of March 2010, Toyota reported more than $200 billion in worldwide sales for the fiscal year that ended in March 2010.

88.   Yoshimi Inaba, President and Chief Executive Officer of Toyota Motor North America, Inc. likewise acknowledged that Toyota had failed its customers.  Mr. Inaba testified in the Senate Sub-Committee hearings on Toyota recalls:

> In recent months we have not lived up to the high standard our customers and the public have come to expect from Toyota, despite our good faith efforts.  As our president, Akio Toyoda, told members of Congress last week, we sincerely regret our shortcomings have resulted in the issues associated with our recent recalls.

89.   Shinichi Sasaki, executive Vice President for Toyota Motor Corporation admitted before Congress that Toyota "did not listen to its consumers":

> How this issue came about is because there were many vehicle – excuse me – many voices were sent to us from the customers, but we really did not listen to every one of them very carefully, one by one.  We should have really listened to them carefully and rendered some technical analysis so that it would be connected to our following product improvement. However, the quality of this work or the efficiency of our work or speed with which we worked had become sluggish, or sort [sic] failed gradually, and this has come to a much larger issue.

/ / /

/ / /

18

90.     On April 5, 2010, NHTSA informed Toyota in a letter that it was imposing a $16.375 million fine for hiding safety defects related to sudden acceleration in 2.3 million vehicles.  NHTSA imposed the record fine after finding that Toyota had failed to notify the National Highway Traffic Safety Administration for at least four months after learning that the accelerator pedals in some of its vehicles could stick and cause sudden unintended acceleration.   Under federal law, automakers are required to disclose defects to NHTSA within five business days.  In its April 5 letter, NHTSA cited how Toyota had sent instructions to its European operations in September 2009 which explained how to fix accelerator pedals that could stick, yet decided against similarly notifying U.S. dealers and government regulators.   The NHTSA letter indicated that Toyota may have known about the Defects for at least three years.

91.     On April 19, 2010, Toyota agreed to pay the $16.375 million fine imposed by NHTSA.  On April 19, 2010, NHTSA Secretary Ray LaHood released a statement saying, "By failing to report known safety problems as it is required to do under the law, Toyota put consumers at risk."

92.     Based on a review of 75,000 documents, the House Committee on Energy and Commerce had three significant concerns with Toyota's recalls and explanations:

> First, the documents appear to show that Toyota consistently dismissed the possibility that electronic failures could be responsible for incidents of sudden unintended acceleration. Since 2001, when Toyota first began installing electronic throttle controls on vehicles, Toyota has received thousands of consumer complaints of sudden unintended acceleration. In June 2004, the National Highway Traffic Safety Administration (NHTSA) sent Toyota a chart showing that Toyota Camrys with electronic throttle controls had over 400% more 'vehicle speed' complaints than Camrys with manual controls. Yet, despite these warnings, Toyota appears to have conducted no systematic investigation into whether electronic defects could lead to sudden unintended acceleration.

///
///

COMPLAINT FOR DAMAGES

93.    This concern is significant because it appears that from 2004 to 2009, Toyota was selling cars without knowledge of what caused the defect or disclosure of the defect.

94.    Next, the Committee rejected tests submitted by Toyota that were conducted at the request of Toyota's litigation counsel, Bowman and Brooke, LLP:

> Second, the one report that Toyota has produced that purports to test and analyze potential electronic causes of sudden unintended acceleration was initiated just two months ago and appears to have serious flaws. This report was prepared for Toyota by the consulting firm Exponent, Inc. at the request of Toyota's defense counsel, Bowman and Brooke, LLP. Michael Pecht, a professor of mechanical engineering at the University of Maryland, and director of the University's Center for Advanced Life Cycle Engineering (CALCE), told the Committee that Exponent 'did not conduct a fault tree analysis, a failure modes and effects analysis ... or provide any other scientific or rigorous study to describe all the various potential ways in which a sudden acceleration event could be trigger' 'only to have focused on some simple and obvious failure causes'; used 'extremely small sample sizes'; and as a result produced a report that "I would not consider ... of value ... in getting to the root causes of sudden acceleration in Defective Vehicles.'

95.    Again, the concern over the Exponent Bowman and Brooke report highlights: (a) that Toyota had no credible prior report or analysis of UA; (b) that Toyota had been selling vehicles without disclosure of the defect; (c) Toyota's inability to understand the basis for the defect; and (d) its failure to provide a fail-safe to prevent unintended acceleration.

96.    The Committee then addressed Toyota's lack of truthfulness in its statements and rejected the notion that floor mats or pedals were the sole cause of the problem:

> Third, Toyota's public statements about the adequacy of its recent recalls appear to be misleading. In a February 1, 2010, appearance on the Today show, you stated that Toyota has "studied the events of unintended acceleration, and [it] is quite clear that it has come down to two different issues," entrapment of accelerator pedals in floor mats and sticky

COMPLAINT FOR DAMAGES

accelerator pedals. In an appearance the same day on CNBC you repeated this claim and reported that Toyota is "very confident that the fix in place is going to stop what's going on." The documents provided to the Committee appear to undermine these public claims. We wrote to you on February 2, 2010, to request any analyses by Toyota that show sticky pedals can cause sudden unintended acceleration. Toyota did not produce any such analyses. To the contrary, Toyota's counsel informed the Committee on February 5 that a sticky pedal "typically ... does not translate into a sudden, high-speed acceleration event." Moreover, our review of the consumer complaints produced by Toyota shows that in cases reported to the company's telephone complaint lines, Toyota personnel identified pedals or floor mats as the cause of only 16% of the sudden unintended acceleration incident reports. Approximately 70% of the sudden unintended acceleration events in Toyota's own customer call database involved that are not subject to the 2009 and 2010 floor mat and "sticky pedal" recalls.

**C.    Toyota Sacrificed Quality while Maintaining Image of Safety and Reliability.**

97.    One reason why Toyota lacks sufficient test data on the reliability of ETCS, and had to rely on a belated report by Exponent and Bowman & Brooke, is the overall slip at Toyota in its attention to quality control. Toyota has sacrificed safety for speed.

98.    In the last ten years, the culture has changed. Now, as acknowledged by Toyota, the emphasis is on fast production. While production and production goals have increased, the number of trained quality control employees has decreased. Experienced assembly and quality workers have been replaced with over a thousand inexperienced and relatively untrained temporary workers.

99.    The result has been a significant increase in quality control problems per vehicle. Defects are ignored in the interest of speed and quantity of production. Defects that in the past would have resulted in stoppage of the line are overlooked. Quality control employees have been often told by supervisors that when they find a defect they are not to record it but are to look for other cars that do not have the defect, and only then report the original defective car as an isolated incident that does not require a

1  recall. Quality control employees are given goals that set an upper limit on the number

2  of defects they are to report.

3  **VI.   FRAUDULENT CONCEALMENT, TOLLING AND ESTOPPEL**

4       100.  After more than eight years of suppression and concealment of the

5  existence and nature of the defects, presumably because it could no longer conceal the

6  rising injury and death toll, in September, 2009, Toyota admitted there was a defect in

7  its vehicles that causes sudden unintended acceleration.  However, Toyota's belated

8  admission only concedes that some of its models have had sudden unintended

9  acceleration and resulting crashes, and Toyota continues its plan and scheme of

10  concealment by denying the existence of the defects in numerous models which also

11  have suffered sudden unintended acceleration.  For example, Toyota claims the defects

12  do "not exist in vehicles in which the driver's side floor mat is compatible with the

13  vehicle and properly secured."   Toyota knows, and knew, this was false because

14  Toyota was fully aware that unintended acceleration had occurred on numerous

15  occasions when there were no floor mats in the involved vehicles. As a direct and

16  proximate result of defects in the subject Toyota vehicle and the wrongful conduct,

17  acts, omissions, and fraudulent misrepresentations of Toyota, Decedents and Plaintiffs

18  have endured conscious pain and suffering and other significant harm.

19       101.  As a further direct and proximate result of defects in the subject Toyota

20  vehicle and the wrongful conduct, acts, omissions, and fraudulent misrepresentations

21  of Toyota, Plaintiffs have incurred medical expenses and other economic harm

22  including loss of Decedents' earnings and lost earning capacity, and will continue to

23  incur expenses and loss of earnings in the future, as a direct and proximate result of the

24  injuries alleged herein as a result of the use of the subject Toyota vehicle.  As a further

25  direct and proximate result of defects in the subject Toyota vehicle and the wrongful

26  conduct, acts, omissions, and fraudulent misrepresentations of Toyota, Decedent

27  Charlene Lloyd required medical treatment, and Plaintiffs have incurred medical

28  expenses, incidental expenses, and funeral and burial expenses.

102.   The acts, conduct, and omissions of Toyota, and each of them, as alleged throughout this Complaint were fraudulent, wilful and malicious and were done with a conscious disregard for the rights of the Decedents, Plaintiffs and users of Toyota's vehicles and for the primary purpose of increasing Defendants' profits from their sale and distribution.  Toyota's outrageous and unconscionable conduct warrants an award of exemplary and punitive damages against Toyota in an amount appropriate to punish and make an example of each of the Toyota Defendants.  Prior to the manufacturing, sale and distribution of the vehicles, the Toyota Defendants and each of them knew that said vehicles were in a defective condition as previously described herein and knew that those who purchased, leased and/or were passengers in said vehicles would experience and did experience severe physical, mental, and emotional injuries.

103.   Further, the Toyota Defendants and each of them through their officers, directors, managers, and agents, had knowledge that the vehicles presented a substantial and unreasonable risk of harm to the public, and as such, were unreasonably subjected to risk of injury or death. Despite such knowledge, the Toyota Defendants, and each of them, acting through their officers, directors and managing agents for the purpose of enhancing Defendants' profits, knowingly and deliberately failed to remedy the known defects and failed to warn the public, including Decedents and Plaintiffs, of the extreme risk of injury occasioned by said Defects inherent in its vehicles.

104.   The Toyota Defendants and their individual agents, officers, and directors intentionally proceeded with the manufacturing, sale, and distribution and marketing of the vehicles knowing persons would be exposed to serious danger in order to advance Defendants' own pecuniary interest and monetary profits. Defendants' conduct was fraudulent, despicable, and so contemptible that it would be looked down upon and despised by ordinary decent people, and was carried on by Defendants with wilful and conscious disregard for the safety of Decedents, entitling Plaintiffs to exemplary damages.

/ / /

105. Any applicable statutes of limitation have been equitably tolled by Toyota's affirmative acts of fraud, fraudulent concealment; suppression and denial of the true facts regarding the existence of the defective acceleration control and throttle system in its vehicles.  Since as early as 2001, Toyota knew of the defects and concealed and suppressed these facts.  However, despite Toyota's exclusive knowledge of the defects, Toyota continued to make statements touting the reliability and safety of its vehicles, and withheld information regarding the dangerous defects that Toyota knew had caused and were likely to cause further serious injuries and deaths.

106. At all times relevant, Toyota has had exclusive knowledge of the dangerously defective nature of the acceleration control and throttle system within its vehicles and continued to conceal these facts from Decedents, Plaintiffs, the public, and NHTSA.

107. The following timeline of documents and events demonstrates Toyota's awareness and concealment of the defective nature of the acceleration control and throttle system:

108. In February 2002, Toyota received its first consumer complaint relating to engine surging when the brakes were depressed.  Ten other similar complaints were received by Toyota by August 2002.  TMC investigated the root cause of the surging, and a May 20, 2002, internal record reported that the "root cause of the surging condition remains unknown" and "no known remedy exists for the surging condition at this time."

109. In response to a NHTSA investigation on similar incidents, Toyota issued at least three "Technical Service Bulletins" related to the issue of unintended acceleration.  On August 30, 2002, Toyota released a bulletin alerting that some 2002 Camry vehicles "may exhibit a surging during light throttle input at speeds between 38–42 MPH with lock-up (L/U) 'ON.'"  Toyota advised that the cars' Engine Control Module (ECM) calibration had been revised to correct the problem.

/ / /

24

110.   Yet, on December 23, 2002, Toyota released another bulletin noting that certain Camrys "may exhibit a triple shock (shudder) during the shift under 'light throttle' acceleration." The bulletin advised dealers to follow the repair procedure in the bulletin to rectify the situation. Less than nine months later, Toyota released a nearly identical advisory notice on May 16, 2003 which cited that some 2003 Camrys "may exhibit a surging during light throttle input at speeds between 38-42 mph with lock-up (L/U) 'ON.'" Again, Toyota claimed the ECM calibration had been revised to correct this condition. The existence of these technical service bulletins was not disclosed to consumers.

111.   On April 25, 2003, NHTSA issued Defect Petition DP03 003. The petitioner requested that the agency to conduct an analysis of 1997 through 2000 Lexus vehicles for "problems of vehicle speed control linkages which results [sic] in sudden, unexpected excessive acceleration even though there is no pressure applied to the accelerator pedal," and noted 271 other complaints he found on the NHTSA website about these vehicles. Thirty-six of the complaints referred specifically to unintended acceleration and described several crashes.

112.   In January 2004, another consumer filed a petition with NHTSA, requesting an investigation of 2002 and 2003 Lexus ES 300s, "alleging that [her] throttle control system malfunctioned on several occasions, one of which resulted in a crash." On March 3, 2004, Office of Defects Investigation ("ODI") opened a Preliminary Evaluation. NHTSA documents describe the problem to be investigated as: "Complainants allege that the throttle control system fails to properly control engine speed resulting in vehicle surge." The investigation was expected to cover more than one million 2002-2003 Camry, Camry Solara and Lexus ES 300 vehicles. ODI had received 37 complaints and reports of 30 crashes resulting in five injuries. Mr. Scott Yon was the designated investigator. He would remain NHTSA's principal investigator on many subsequent investigations and developed a close relationship with Toyota executives, some of whom had been NHTSA employees.

COMPLAINT FOR DAMAGES

113.   The NHTSA investigation specifically described the defect alleged by vehicle owners, in part, as:

> Allegations of (A) an engine speed increase without the driver pressing on the accelerator pedal or, (B) the engine speed failing to decrease when the accelerator pedal was no longer being depressed – both circumstances requiring greater than expected brake pedal application force to control or stop the vehicle and where the brake system functioned normally.

114.   On June 3, 2004, Scott Yon sent to Christopher Santucci, a Toyota employee in Technical and Regulatory Affairs, an email showing a greater than 400% difference in "Vehicle Speed" complaints between Camrys with manually controlled and electronically controlled throttles. (See Exhibit 2).   This statistically significant increase in the number of unintended acceleration complaints put Toyota on notice that there was a defect in its vehicles with electronic throttle controls that could potentially cause unintended accelerations.

115.   In a June 19, 2004 letter to NHTSA, Toyota falsely stated that its ETCS contained a built-in redundancy to prevent acceleration, and that in the event of sudden acceleration the "vehicle brakes would have restrained vehicle motion."   Toyota continued to maintain this position for years, even though it knew that Toyota-manufactured vehicles can and do experience sudden unintended acceleration and that application of the brakes has failed to restrain vehicle motion

116.   Motor vehicle manufacturers frequently re-design their vehicles, as when Toyota implemented ETCS. But having taken that step, Toyota should have monitored NHTSA's consumer safety database for indications of changing patterns in the complaints by model that signaled the need to review the safety of ETCS and the need to implement a robust fail-safe, including, but not limited to, an effective brake-override.

/ / /

COMPLAINT FOR DAMAGES

117. At the outset of its 2004 investigation, NHTSA asked Toyota for information on similar incidents including the number of complaints, field reports, crash reports, property damage claims and lawsuits. The decision on how to respond to NHTSA emanated from a group of Toyota employees, including Christopher Tinto and Christopher Santucci in Washington, D.C., as well as others from the Product Quality and Service Support group in Torrance, CA. The scope of NHTSA's information request became the subject of negotiations between Christopher Tinto and Christopher Santucci of Toyota and NHTSA representatives, with the result that certain relevant categories of incidents were excluded from Toyota's reporting of events.

118. In its response to NHTSA's information request, Toyota denied that a defect existed, stated that there was no defect trend and that its electronic control system could not fail in ways its engineers had not already perceived. Toyota reported 123 complaints that it said "may relate to the alleged defect." But Toyota excluded from its response the following relevant categories of complaints, among others:

(1)    an incident alleging uncontrollable acceleration that occurred for a long duration;

(2)    an incident in which the customer alleged that he could not control a vehicle by applying the brake; and

(3)    an incident alleging unintended acceleration occurred when moving the shift lever to the reverse or the drive position.

119. Toyota thus concealed from NHTSA and the public relevant customer complaints.

120. NHTSA closed the investigation without testing of the integrity of the ETCS-i, without reviewing any records of Toyota's test reports concerning the ETCS-i, and without reviewing whether the braking system was effective in an open- throttle condition. Toyota itself did not have the capability of fully modeling, testing or validating the safety of ETCS-i because of its failure to implement standard design

1 platforms, its failure to develop and/or conduct meaningful ECM test procedures, and
2 its failure to exercise appropriate control over third-party subsystem designs.

3    121.  While Toyota continued to claim that there was no unintended
4 acceleration defect, other independent experts concluded otherwise.  In May 2004, a
5 Forensic Technologist and MSME examined a vehicle in New Jersey that had
6 experienced a UA event.  The report was forwarded to Toyota on January 13, 2005.  It
7 concluded that the vehicle's ETCS was not operating correctly.   Upon information and
8 belief, this report was not provided to NHTSA.

9    122.  In August 2005, NHTSA opened Defect Petition DP05-002 to investigate
10 a consumer's claims relating to unintended acceleration in the 2002 Camry.  Scott Yon
11 again was assigned as NHTSA's investigator.   The target vehicle population was
12 1,950,577 2002-2005 Camrys and Lexus ES models.  After receiving the petition and
13 reviewing the underlying complaints, Toyota did not launch its own investigation or
14 identify any new tests that it would perform to check for a defect in the ETCS.  Instead,
15 in a November 15, 2005 letter to NHTSA, Toyota recommended NHTSA deny the
16 petition based only on the information Toyota had previously provided "as well as the
17 lack of evidence supporting concurrent failure of the vehicle braking systems."  After
18 explaining how the electronic throttle system and its fail-safes were designed to
19 operate, Toyota concluded:

20        [T]here is no factor or trend indicating that a vehicle or
21        component defect exists.   Toyota believes that this Defect
22        petition to be similar to other, prior petitions and investigations
23        into mechanical throttle controls.  Toyota has found no evidence
24        that differentiates that consumers alleging vehicles equipped
25        with electronic throttle controls can suddenly accelerate when
26        compared to those equipped with mechanical throttle controls.
27        Toyota has not found any evidence on the vehicles of brake
28        failure, let alone brake failure concurrent with ETC failure.

28

1  123.  This response of "no evidence" ignores and concealed the spike in UA
2  events that occur within one year of a vehicle switching to ETCS, a trend known to
3  Toyota.

4  124.  On September 22, 2005, Carol Hargrave of TMS' Customer Relations
5  Department wrote the following in a letter to a concerned Lexus owner who had
6  complained to Toyota about her experiences of unintended acceleration:

7  > It is our understanding that you reported that you stepped on the
8  > brake pedal and the vehicle accelerated and that this has
9  > happened several other times.

10  > As you are aware your vehicle was inspected in regards to your
11  > concerns with the brakes and unintended acceleration.  **Your**
12  > **concerns could not be duplicated.**  The throttle body was
13  > inspected and there was no binding and the cable operated
14  > freely.   The vehicle was test driven and the brakes were
15  > functioning properly.  There were no codes to indicate any type
16  > of failure of the system.

17  > **It is virtually impossible for this type of incident to happen.**
18  > The brakes and the throttle are two totally separate systems and
19  > both would have to fail at exactly the same time.  The brakes
20  > will always over ride the throttle." (Emphasis added).

21  125.  In December 2005, in connection with the IS 250 All Weather Drive
22  investigation, Toyota removed any reference to speed control in letters sent to owners,
23  as evidenced by an email drafted by George Marino:  "They pulled out the 'vehicle
24  speed control' part.  NHTSA may come back, but TMC wanted to try." (See Exhibit 3,
25  TOY-MDLID00002896; TOY-MDLID00002900).

26  126.  In September 2006, ODI opened Defect Petition DP06-003 in order to
27  investigate incidents relating to vehicle surging in 2002-2006 Camry and Camry Solara
28  vehicles.

COMPLAINT FOR DAMAGES

127.   Instead of expressing willingness to investigate the issue,  in internal emails Chris Santucci expressed skepticism of the Petitioner's account of the unintended acceleration and hope that NHTSA would not ask Toyota to provide any additional data as part of the investigation:  "Hopefully, this is just an exercise that NHTSA needs to go through to meet its obligations to the petitioner.  Hopefully, they will not grant the petition and open another investigation." (See Exhibit 4, TOY-MDLID00044092).

128.   In a February 27, 2007 email sent by Michiteru Kato to Christopher Santucci, Mr. Kato decided against sending his most knowledgeable ECU engineer to an ECU demonstration being conducted for NHTSA, in order to avoid questions regarding ECU failures: "...I thought that 3 guys from TMS is too many (two at most), and if the engineer who knows the failures well attends the meeting, NHTSA will ask a bunch of questions about the ECU. (I want to avoid such situation)."  (See Exhibit 5, TOY-MDLID00075574).

129.   On March 29, 2007, ODI, apparently prompted by customer complaints of unwanted acceleration in 2007 Lexus ES 350 vehicles, opened PE07-016.   The principal investigator was again Scott Yon.  The stated "Problem Description" in the Opening Resume was "[t]he accessory floor mat interferes with the throttle pedal." Toyota attempted to prevent the opening of the investigation by offering to send a letter to 2007 ES 350 owners "reminding them not to install all weather mats on top of existing mats."   As evidenced by an email from Chris Tinto, NHTSA did not agree: "NHTSA feels that they have too many complaints on this one vehicle to drop the issue; The results of a stuck throttle are 'catastrophic.'"   (See Exhibit 6, TOY-MDLID00003908).

/ / /
/ / /
/ / /
/ / /

COMPLAINT FOR DAMAGES

1    130.   In an email dated April 2, 2007, George Morino urged others within

2   Toyota to re-frame the investigation as an "All Weather Floor Mat issue," and carefully

3   eliminated reference to the much broader and more alarming issue of unintended

4   acceleration:

5           Sorry we had a last minute change to the Q&A.  Please utilize

6           this revised version of the Statement and Q&A.  The issue has

7           been posted on the NHTSA website.

8           Sorry!

9           [Old]

10          NHTSA has received five consumer complaints regarding

11          unintended throttle control in the vehicles.

12          [New]

13          NHTSA received five consumer where the All Weather Floor

14          Mat may have interfered with the accelerator pedal operation.

15   (*See* Exhibit 7, TOY-MDLID00000566).

16    131.   Despite the growing number of UA complaints, Toyota had knowledge of

17   fail-safe mechanisms that protect against unintended acceleration, but failed to employ

18   them.  In August 2007, in internal emails entitled "UPDATE on ES 350 investigation,"

19   Chris Santucci stated that NHTSA investigators had discussed with him fail-safe

20   mechanisms used by other vehicle manufacturers to protect against unintended

21   acceleration, including "[u]sing ETC to shut down throttle control" and "cutting off the

22   throttle when the brakes are applied."  Mr. Santucci also noted, "Jeff [Quandt, Chief,

23   Vehicle Controls Division, Office of Defects Investigation] mentioned that another

24   manufacturer allows the engine to be shut off if you press the ignition button

25   repeatedly."  (*See* Exhibit 8, TOY-MDLID00000295)

26   / / /

27   / / /

28   / / /

31

132. On August 8, 2007, ODI upgraded PE07-016 to engineering analysis EA07-010, intending to investigate unintended accelerations in a target population of 98,454 2007 Lexus ES 350s. The Opening Resume for EA07010 states, in part, as follows:

> [T]he agency has 40 complaints; eight crashes and 12 injuries. Complainants interviewed by ODI stated that they applied the throttle pedal to accelerate the vehicle then experienced unwanted acceleration after release. Subsequent (and sometimes repeated) applications of the brake pedal reduced acceleration but did not stop the vehicle. In some incidents drivers traveled significant distances (miles) at high vehicle speeds (greater than 90 mph) before the vehicle stopped (ODI notes that multiple brake applications with the throttle in an open position can deplete the brake system's power [vacuum] assist reserve resulting in diminished braking).

133. In September 2007 Toyota acknowledged internally that that "floor mat interference is possible in **any vehicle with any combination of floor mats.**" (Emphasis added). Despite this admission, no broader recall or effort to implement a brake override took place. (*See* Exhibit 9, TOY-MDLID00002839).

134. At the same time Toyota was pointing the finger at floor mats, it was investigating UA events that it knew were not caused by floor mats, including an event where the service manager at Cedar Rapids Toyota confirmed the UA was not caused by the mat. Toyota replaced the throttle pedal assembly.

135. Despite having received a number of complaints of unintended acceleration that could not be explained in terms of floor mats, Mr. Yon's description of the investigation made no mention of any intent to study the electronic throttle control system employed. Toyota did not study the ETCS system either.

/ / /

136.   In September 2007, Toyota successfully limited a UA investigation by negotiating what terms it would use to search for relevant complaints. When the company searched for incidents, it used the term "mats" as opposed to "surging." A search for surging on just the Camry in 2004 revealed "60,000 complaints." Surging may be related to UA, but Toyota never revealed the 60,000 surging complaints.

137.   A September 14, 2007 email from Chris Tinto demonstrates that internally, Toyota executives were pleased that NHTSA had limited the ES350 unintended acceleration issue to a "floor mat" recall, and that this limitation saved the company "upwards of one hundred million dollars:"

> Of note, NHTSA was beginning to look at vehicle design parameters as being a culprit, focusing on the accelerator pedal geometry coupled with the push button "off" switch.   We estimate that had the agency instead pushed hard for recall of the throttle pedal assembly (for instance), we would be looking at upwards of $100M + in unnecessary cost.

(*See* Exhibit 10, TOY-MDLID00004972)

138.   Toyota also knew at this time that the root cause of sudden unintended acceleration was not often traceable, as demonstrated by Chris Tinto's email dated October 19, 2007:  "[O]ne big problem is that no codes are thrown in the ECU so the allege [sic] failure (as far as we know) can not be documented or replicated."   The implications were that "the service tech therefore can't fix anything, and has no evidence that any problem exists."  (*See* Exhibit 11, TOY-MDLID00050747)

139.   This same email chain also discloses the fact that it was Toyota's intention in 2007 to "stop this from moving forward;" a reference to the possibility of a public hearing before Congress on unintended acceleration years before the congressional hearings actually occurred in 2010.  (*See* Exhibit 11).

/ / /

/ / /

COMPLAINT FOR DAMAGES

140. In late 2007, Toyota employees, including George Morino from the Torrance, CA office, were aware of increasing reports of UA in Tacomas. On November 6, 2007, Toyota employees reviewed the NHTSA consumer complaints database and counted "21 complaints pertaining to the Tacoma sudden acceleration." Toyota internal e-mails also indicate that they were finding Internet blog posts regarding UA events in Tacomas in November 2007.

141. While the Tacoma investigation was ongoing, ODI opened a Preliminary Evaluation into unintended acceleration incidents involving 54,000 2004 Toyota Siennas. PE08-025 resulted from a report that a driver applied the accelerator pedal to accelerate the vehicle and experienced unwanted acceleration upon releasing the pedal. Field data collected by ODI indicated that when a retainer pin is missing from the driver's side center stack/console trim panel, the panel can detach from the console, and the accelerator pedal can become entrapped under the trim panel causing unwanted acceleration. Five years earlier, in April 2003, Toyota had experienced a UA event during testing of a 2004 Sienna. This incident was purportedly also caused by a trim panel on the center console interfering with the accelerator pedal.

142. In an internal Toyota PowerPoint presentation by Chris Tinto dated January 2008, Toyota characterized the Camry and Lexus ES floor mat investigation as a "difficult issue" that it "ha[d] been quite successful in mediating." The presentation went on to note that such "mediations" were "becoming increasingly challenging" and that "despite the fact that we rigorously defend our products through good negotiation and analysis, we have a less defensible product."

143. In another internal PowerPoint Toyota addresses "Key Safety Issues" including the following:

• 'Sudden Acceleration' on ES/Camry, Tacoma, LS, etc.

• Recurring issue, PL/Design Implications.

(Emphasis added). (*See* Exhibit 12, TOY-MDLID00052956).

/ / /

COMPLAINT FOR DAMAGES

144. Also in 2008, Toyota knew that it had received a "huge number of complaints" alleging forms of UA Toyota labeled as "surge," or "lunge" or "lurch" if it searched for UA events just on the Camry:

> Let's discuss the response with George sometime on 10/13. We just started to gather the field information in order to update it requested in Q2, 3, 4 of IR for PE07-016. However, I'm very concerned about how many customer complaints will be extracted from CAN2000 by keyword search which we usually do. Because NHTSA expanded the scope of the vehicles to 2007-2009MY ES and "CAMRY." As you know, Camry has had an issue on the 6 speed automatic transmission and there may be a huge number of complaints alleging the surge or lunch or lurch and we usually include those words for the keyword search. If this is the case, it will take long time to complete.

145. On April 18, 2008, Toyota filed its first response in DP0-800 1, reporting a total of 326 unique vehicle complaints of unintended acceleration in Tacomas.

146. On April 25, 2008, Toyota filed its second response in the Tacoma investigation, outlining its investigation into the problem and analyzing the consumer complaints submitted to Toyota and to NHTSA that could be related to alleged unintended acceleration. In Toyota's view, neither the consumer complaints nor the field study indicated the existence of any defect in the vehicles, much less a safety-related defect.  Toyota disputed the assertion in the petition that the 32 complaints in the NHTSA database "in and of themselves justify opening an investigation." Toyota claimed that the Tacoma had been the subject of extensive media coverage related to the possibility of sudden acceleration. In addition, Toyota claimed that there had been a high level of internal activity on this subject (as far back as early 2007) including reports by members of Tacoma user groups detailing conversations with ODI staff and providing ODI contact information.

35

147. On June 11, 2008, Toyota sent its first response to ODI in PE08-025 regarding 2004 Siennas, followed by a second response on June 25, 2008. Toyota stated that complaints about UA took two forms: allegations of excessive engine speed and/or power output without the driver pressing on the accelerator pedal, or the engine speed and/or power output failing to decrease (subside) when the accelerator pedal was no longer being depressed by the driver. Toyota also said that it saw no evidence of a defect, explained that the trim could catch the accelerator, and described the design changes it made to the trim panel to correct the problem. Toyota did not disclose that it had considered and had the ability to incorporate brake-override and other fail-safe mechanisms that would address this problem.

148. On August 27, 2008, NHTSA denied the Tacoma petition, concluding:

> The complaints fell into three groups. A majority of the complaints may have involved the Tacoma's throttle control system. Some complaints did not involve a failure of the throttle control system. For the remaining reports, although there may have been an issue with the throttle control system as one possible explanation, we have been unable to determine a cause related to throttle control or any underlying cause that gave rise to the complaint. For those vehicles where the throttle control system did not perform as the owner believes it should have, the information suggesting a possible defect related to motor vehicle safety is quite limited. Additional investigation is unlikely to result in a finding that a defect related to motor vehicle safety exists or a NHTSA order for the notification and remedy of a safety-related defect as requested by the petitioner. Therefore, in view of the need to allocate and prioritize NHTSA's limited resources to best accomplish the agency's safety mission, the petition is denied.

149. On October 15, 2008, Toyota created a confidential PowerPoint presentation to ODI regarding unintended acceleration and trim interference in 2004 Siennas as part of EA08-014. Toyota demonstrated how an unrestrained early design-level trim panel interacted with the accelerator after pedal depression. Toyota also advised that the company was conducting a field survey to examine panel retention and that preliminarily one vehicle had been identified with a concern.

COMPLAINT FOR DAMAGES

150.   On December 12, 2008, in a Field Technical Report confirmed an incident of unintended acceleration stating that: "After traveling 20-30 feet the vehicle exhibited a slight hesitation then began to accelerate on its own.  Engine speed was estimated to have gone from 1500 rpm to 5500 rpm at the time of the occurrence...Probable Cause =Unknown."

151.   On January 26, 2009, ODI closed EA08-014 after Toyota agreed to recall vehicles built between January 10, 2003, and June 11, 2003. Toyota then issued Recall 09V023 for 26,501 model year 2004 Siennas. Toyota did not describe this as a defect, but called the actions a "safety improvement campaign" that was not being conducted under the Safety Act. Toyota's recall instructed dealers to replace the original floor carpet cover with the newer-design floor carpet (and retention clip) at no charge to the owner. The repair was expected to reduce the potential for trim panel interference with the accelerator pedal should the retaining clips become missing because of improper service or other reasons. Dealers were to replace the retention clip and floor carpet cover at no charge.

152.   Toyota continued to receive reports from qualified engineers opining the abnormalities in the ECTS. For example, on January 28, 2009 a Professional Engineer examined a 4Runner that:

> According to the driver of the vehicle, she had driven the 4Runner earlier in the day of the incident. She stated that when she started the vehicle, placed the gear selector lever in the reverse and depressed the accelerator pedal, the vehicle accelerated rearward in an uncontrolled manner. The vehicle traveled down her driveway, crossed a road, struck a stump and entered a stream. The vehicle came to rest on its driver side. She exited the vehicle through the sun roof. She stated that she had never had any drivability issues with the 4Runner.

The report concluded:

> Based on the foregoing observations and analysis, the following are my opinions, to a reasonable degree of engineering certainty, regarding the condition and operation of the Toyota 4Runner.

COMPLAINT FOR DAMAGES

1

\* \* \*

2     Third, the voltages associated with the throttle position sensor malfunction
3     detection (w/ pedal depressed) and the accelerator pedal position sensor
      for engine control (w/ pedal depressed) were not within specifications.
4     The voltage deviations indicate that the electronic throttle control system
      featured abnormalities. The inability to start the vehicle precluded testing
5     the functional operation of the system.

6

7     153.   In a Case Detail Report dated February 6, 2009 a consumer reported: "We

8     just got a 2008 LE 4Cyl with the 5spd auto. Only had it two weeks. When driving 35-

9     45mph, the tranny will shift up into 5th gear and then basically STAY there. As we

10    approach a slight upward grade, the tachometer is stuck at 1200 RPM and the whole

11    car shudders and vibrates as the engine "lugs" down. We find ourselves constantly

12    playing with the gas pedal in order to FORCE the tranny to downshift. Took it to

13    dealer. They......experienced same thing. They said it was 'Normal for this model - at

14    this time.' They quietly told me they are getting other complaints and look forward to

15    Toyota releasing new programming for the ECU." Rather than provide an appropriate

16    repair at this time, Toyota often blamed these types of reports of sudden unintended

17    acceleration on the driver.

18    154.   Toyota never fully disclosed to the regulators the actual numbers of

19    customer reports of unintended acceleration events in the various Toyota models under

20    investigation that the company had received.  In fact, Toyota disclosed that it had

21    received only 1,008 such complaints.  Three years later, however, Toyota would be

22    required to disclose to Congressional investigators that it had received 37,900

23    complaints potentially relating to sudden acceleration in Defective Vehicles from

24    January 1, 2000, through January 27, 2010.

25    / / /

26    / / /

27    / / /

28

COMPLAINT FOR DAMAGES

155.   In a May 5, 2009 email sent to Takeharu Nishida, Chris Santucci discusses information to be requested by NHTSA in relation to another defect petition. Rather than providing all relevant documentation to assist in the investigation, Mr. Santucci expresses his pleasure over the fact that NHTSA will not be requesting inexplicable reports related to throttle issues: "They [NHTSA] are struggling with sending an IR letter, because they shouldn't ask us about floormat issues because the petitioner contends that NHTSA did not investigate throttle issues other than floormat-related. So they should ask us for non-floormat related reports, right?  But they are concerned that if they ask for other reports, they will have many reports that just cannot be explained.  And since they do not think that they can explain them, they don't really want them.  Does that make sense?  I think it is good news for Toyota." (*See* Exhibit 13, TOY-MDLID00052918).

156.   What was good news for Toyota, i.e., NHTSA avoiding inquiry into non-floor-mat issues, was bad news for consumers who continued to purchase and drive vehicles subject to a hidden UA defect.

157.   In a power point presentation dated July 6, 2009, Toyota's lead executive in American Operations, Yoshi Inaba, describes as a "win" the fact that Toyota saved $100 million dollars by negotiating an "equipment" recall instead of some other alternative safety measure to address the sudden acceleration issue: "Wins for Toyota – Safety Group ... Negotiated 'equipment' recall on Camry/ES re: SA, saved $100M+, w/ no defect found."  Toyota knew that it had saved millions of dollars through concealing the known potential for unintended accelerations in its vehicles.

158.   NHTSA remained concerned that a "serious issue" remains and that a factor other than mats was causing UA events.  NHTSA was considering an announcement that would instruct vehicle owners how to turn off the vehicle in the event of a UA event.  NHTSA also expressed concern that other vehicles, including Prius, Camry and Avalon may be subject to floor mat jamming and pedal design issues. Toyota did not disclose these concerns and took no action to remedy these defects.

159.   Years later, in 2010, Toyota recalled the ES 350, Camry and Avalon, due to a defect in the shape of the floor surface and the lack of adequate space between the accelerated pedal and the floor.

160.   In August 2009, the Saylor accident involving a 2009 Lexus ES350 occurred in San Diego, California. When officers inspected the vehicle, the all weather floor mat was melted to the accelerator pedal and unsecured by the retaining clips. It was also the incorrect all weather floor mat for that Lexus model. When officers tested the pedal clearance using the same model of Lexus and the same mismatched floor mat, they observed that the pedal could easily become stuck under its edge.

161.   The San Diego County Sherriff's Report concludes that the Saylor crash was likely caused by the mismatched floor mat and the following "associated" factors:

> The vehicle was not equipped with a key that would otherwise allow for manual emergency shut off. The push button ignition feature had no emergency instantaneous shut capability.  As evidenced in the inspection of [the Lexus], the brakes most likely failed due to over burdened, excessive, and prolonged application at high speed.

162.   The report also notes that additional electrical, mechanical or computer generated factors could have played a role in the unintended acceleration.

163.   Following the widespread publicity surrounding the four-fatality Saylor crash near San Diego, Toyota issued a "Safety Advisory," saying that the company had "taken a closer look" at the potential for the accelerator to get "stuck in the full open position" due to interfering floor mats. The advisory stated that the company would soon be recalling certain 2007-2010 Camry and Lexus vehicles, 3.8 million in all, to address the issue – the largest recall in Toyota's history and the sixth largest in the United States. According to Senator Waxman, Toyota's advisory is dangerously misleading, for the following reasons, among others:

/ / /

/ / /

COMPLAINT FOR DAMAGES

By suggesting that only a trapped floor mat can cause a loss of throttle and braking control, it lulls owners of models with no driver's side floor mat into believing there is no possibility of a potentially catastrophic loss of throttle and braking control. According to documents supplied by Toyota to the Committee on Energy and Commerce of the U.S. House of Representatives, fewer than 16% of sudden, unintended acceleration events reported by customers involved floor mats and/or "sticky pedals."

The advisory also misleads owners with a driver's-side floor mat into believing that, in the event of a sustained near-wide-open throttle malfunction, the first response should be to visually determine if the floor mat is interfering with the accelerator pedal.

164.   In a September 1, 2009 email "[t]o all concerned staff," Koji Sakakibara's evidences the fact that Toyota was aware of the unintended acceleration problem back in 2007 but opted not to develop additional safety measures at that time:

To all concerned staff,

The following information has been received from TMS-PQSS Public Affairs Group regarding the above (America ES350 article...addition #2). (Please see photos at the bottom of this mail.) Within America, there are 196 articles on Google News, so the mass media is interested.

- **During the floor mat sticking issue of 2007, TMS suggested that there should be "a fail safe option similar to that used by other companies to prevent unintended acceleration".** I remember being told by the accelerator pedal section Project General Manager at the time (Mr. M) that "This kind of system will be investigated by Toyota, not by Body Engineering Div". Also, that information concerning the sequential inclusion of a fail safe system would be given by Toyota to NHTSA when Toyota was invited in 2008. **(The NHTSA knows that Audi has adopted a system that closes the throttle when the brakes are applied and that GM will also introduce such a system.**

==>In light of the information that "2 minutes before the crash an occupant made a call to 911 stating that the accelerator pedal was stuck and the vehicle would not stop", I think that Body Engineering Div. should act proactively first (investigate issues such as whether the accelerator assy structure is the cause, how to secure the floor mats, the timing for introducing shape improvements). - Furthermore, taking into account the

41

circumstances that "in this event a police officer and his entire family including his child died", TMS-PQSS Public Affairs Group thinks that "the NHTSA and the USA public already hold very harsh opinions in regards to Toyota". (As I think you know, in some cases in the USA "killing a police officer means the death penalty".)

- In light of the above, it would not be an exaggeration to say that even more than the nuance of the information passed from Customer Quality Engineering Div. External Relations Dept. to Body Engineering Div, "the NHTSA is furious over Toyota's handling of things, including the previous Tacoma and ES issues.

Considering the importance of this matter, any correspondence regarding this issue including the reply from Body Engineering, no matter how small, must be sent to the Customer Quality Engineering Div. General Manager and the Customer Quality Engineering Div. External Relations Dept. General Manager. (If possible, please exchange information with the Customer Quality Engineering Div. rather than replying to me.)

(Emphasis added). (*See* Exhibit 1).

165.   On September 25, 2009, Mr. Santucci explains to other Toyota employees in a "privileged and confidential" email what NHTSA had come to believe to be the underlying defect in Toyota vehicles:  "What they are purporting to be unsafe is the vehicle's response to a trapped accelerator pedal (difficulty shutting off the engine, shifting to neutral, etc.). In addition, they believe our system is not state of the art in safety technology. As they have told us, other manufacturers have ECT systems in production that shut off the throttle if the brakes and gas are applied simultaneously." (*See* Exhibit 14, TOY-MDLID00025099).

166.   Also in September 2009, another Toyota internal document demonstrates how "global ramifications," rather than safety dictated Toyota's position with respect to "vehicle defect:"

/ / /

/ / /

/ / /

42

TMC on the other hand will most likely not easily budge from their position that there is no vehicle defect. Especially considering the global ramifications. In addition, since no one of any rank (VP or higher) at TMS has communicated the significance and impact of this issue, TMC may feel that we can weather an investigation and additional media coverage.

167.   On September 29, 2009, the same day that TMC recalled 3.4 million vehicles in the United States because of possible floor mat entrapment, Toyota Motor Europe issued a Technical Information ("TI") to Toyota distributors in Austria, Belgium, Cyprus, the Czech Republic, Denmark, Estonia, Finland, France, Germany, Greece, Holland, Hungary, Iceland, Ireland, Israel, Italy, Malta, Norway, Poland, Turkey, Portugal, Russia, Slovenia, Spain, Sweden, Switzerland, Ukraine, the United Kingdom, Georgia, Kazakhstan, and Romania identifying a production improvement and repair procedure to address complaints by customers in those countries of sticky accelerator pedals, sudden RPM increase and/or sudden acceleration – but nothing similar was issued to warn United States distributors.

168.   Despite its claimed extensive investigation into the sticky pedal phenomenon, and its efforts to remedy the sticky pedal defect for overseas consumers, TMC continued to conceal information from United States consumers regarding potential causes for sudden unintended acceleration events. On September 29, 2009, TMC issued a Consumer Safety Advisory claiming that the sudden acceleration problem was caused by floor mats without mention of the sticking accelerator pedal defect it knew about since July 6, 2006, at the latest, and had confirmed no later than June 2009.

169.   Contemporaneously with the floor mat recall, Toyota made media statements inaccurately stating that NHTSA had determined that no defect exists in vehicles wherein the driver's side floor mat is compatible with the vehicle and is properly secured. For example, a November 2, 2009 press release issued from Torrance, CA announced:

43

Toyota Motor Sales ... today announced that it has begun mailing letters to owners of certain Toyota and Lexus models regarding the potential for an unsecured or incompatible driver's floor mat to interfere with the accelerator pedal and cause it to get stuck in the wide-open position. The letter, in compliance with the National Traffic and Motor Vehicle Safety Act and reviewed by the National Highway Traffic Safety Administration ... also confirms that no defect exists in vehicles in which the driver's floor mat is compatible with the vehicle and properly secured.

170.   On November 4, 2009, NHTSA issued a press release to correct this misleading and inaccurate information. NHTSA clarified that it told Toyota and consumers that "removing the recalled floor mats is the most immediate way to address the safety risk and avoid the possibility of the accelerator becoming stuck." NHTSA reiterated that the floor mat recall was simply an interim measure, and did not correct the underlying defect.

171.   Despite initiating its plan to repair defective accelerator pedals for overseas consumers, Toyota's misinformation to United States consumers continued.

172.   TMC posted the following response to a question posed by the Los Angeles Times:

Q2: Toyota has conducted numerous recalls related to sudden acceleration over the past decade in the U.S. and Canada, including two previous floor mat recalls. But the problem has continued. Does this mean that the previous recalls were not successful in eliminating the problems and if so, why not? In particular, why wasn't the 2007 recall of Lexus ES and Camry floor mats effective in preventing catastrophic accidents such as the Saylor case?

A. Toyota has conducted two all-weather floor mat (AWFM) recalls after receiving reports that if the floor mat (either by itself, or if it is placed on top of an existing carpeted floor mat) is not secured by the retaining hooks, the mat can move forward and interfere with the accelerator pedal returning to the idle position. If the mat is properly secured, it will not interfere with the accelerator pedal.

/ / /

/ / /

44

173.  As reported in the law enforcement investigation, the floor mat in the Saylor accident was not only improperly secured, it was incompatible and incorrect for the vehicle. The recall recently announced addresses the fact that incompatible floor mats, or multiple floor mats could be installed and that the remedy must address that possibility.

174.  When Transportation Secretary Ray LaHood testified before the House Sub-Committee in regard to the Toyota recalls, he explained that NHTSA officials chose to meet directly with Toyota executives in Japan to discuss safety issues because NHTSA "felt that maybe the people in Japan were a little bit safety deaf."

175.  In early 2010, Toyota's internal documents and emails discuss "phase 1 of Safety Recall 90L...Potential Floor Mat Interference with Accelerator Pedal." Although not implied by the name, this recall included the installation of new brake override software in 2007-2010 Camry and Camry Hybrid vehicles to provide customers with "an extra measure of confidence."   (*See* Exhibit 15, TOY-MDLID00000384)   Given Toyota's knowledge of the prevalence of unintended acceleration events and the importance of this safety issue, rather than merely installing the software in non-hybrid Camry vehicles, Toyota should have issued a separate "brake override system installation" recall and included additional vehicle models.

176.  In view of the propensity of Toyota's vehicles to suddenly accelerate out of the drivers' control, the vehicles are defective for failure to have an appropriate fail-safe. Toyota identified each of these fail-safes yet failed to implement them in a timely fashion as reflected in an internal "Privileged and Confidential" e-mail:

> **Push Button Ignition**
>
> One of the ways to stop a "runaway" vehicle is to shut off the engine while the vehicle is in motion. NHTSA is concerned that owners are unclear how to shut off the engine when the vehicle is in motion. In addition, the ES350 owners manual is unclear (see attached letter re: Pepski Petition). NHTSA has surveyed

45

ES350 owners and informed me that they believe their data indicates owners are not familiar with the Toyota functionality. The Toyota Smart Key System requires the operator to hold the ignition button for 3 seconds to shut off the engine when the vehicle is in motion. When the vehicle is stopped, a momentary press of the ignition button shuts off the engine. NHTSA has reports that some owners tried tapping the ignition button to shut it off instead of holding it for three seconds. While they do not believe this is the correct method, they have been working with the SAE to develop a standard for keyless ignition systems. But it is important to note that they think it is one of the attributes that may lead to the occurrence of the long-duration, high speed events.

***Sequential Shift Transmission***

Another way to stop a runaway vehicle is by placing the transmission in Neutral. NHTSA is concerned that the layout of the Sequential Shift Transmission my confuse the operator (especially in a panic situation) because the "N" is adjacent to the "+." To the left of the D position is a gated area where the shift lever can be pushed forward to upshift, and pulled back for a downshift. The N position is above the D position. In such a layout, the "+" and the "N" are very close to the same longitudinal position, with the "+" closer to the driver. If, NHTSA supposes, the transmission was in the Sequential Shift mode, the driver could confuse the upshift position for the neutral position. They believe that in a panic situation, there is a chance this could occur.

///

COMPLAINT FOR DAMAGES

*Braking Effectiveness*

With an accelerator pedal stuck at wide open throttle, NHTSA agrees that one forceful application of the brake pedal can safely stop the vehicle. However, in many reports and inspections they have found brakes burned or brake pads completely depleted after the event. NHTSA understands that with the engine at wide open throttle, vacuum is not being supplied to the brake booster. This means that the power braking system has potentially two or three applications left before the vacuum assist is depleted. They believe that in the long duration events, the brake booster is being depleted by the driver. They think that the driver that initially experiences the event recognizes the vehicle is accelerating and presses the brakes. The vehicle slows, so the driver releases the brakes and the vehicle accelerates again. They repeat this process and before they realize, the power assist is lost and the vehicle becomes more difficult to stop. The driver applies the brake pedal with a lot of force, and this can result in severe damage to the braking system, and/or a brake fire.

177. A January 8, 2010 email demonstrates that the new brake override software had not been emphasized internally, nor was it well understood by TMS employees in early 2010: "As discussed previously, there is almost no information – certainly no general understanding – about the brake override system within TMS at this time." (*See* Exhibit 16, TOY-MDLID00015526).

/ / /
/ / /
/ / /
/ / /
/ / /

47

178.   On January 16, 2010, in an email to Katsuhiko Koganei, Irv Miller admits Toyota has been concealing defects from its customers and that the time has come for the company to come clean: "I hate to break this to you but WE HAVE a tendency for MECHANICAL failure in accelerator pedals of a certain manufacturer on certain models.  We are not protecting our customers by keeping this quiet.  The time to hide on this one is over.  We need to come clean and I believe that Jim Lentz and Yoshi are on the way to DC for meetings with NHTSA to discuss options...We better just hope that they can get NHTSA to work with us in coming with a workable solution that does not put us out of business."   (*See* Exhibit 17, TOY-MDLID00027481)    This mechanical tendency for failure was known to Toyota for years and still has not been properly disclosed.

179.   On or about January 19, 2010, Toyota representatives including Yoshimi Inaba, James E. Lentz, and Christopher Reynolds met with NHTSA at its headquarters in Washington, DC. In the meeting, Toyota finally provided NHTSA with field reports on the sticky pedal incidents. Toyota did not issue any safety advisories to United States consumers regarding the sticking pedal issue until January 21, 2010, when it issued the sticky pedal recall. The recall involved approximately 2.3 million defective vehicles.

180.   On January 21, 2010, Toyota notified NHTSA that it was submitting a "Defect Information Report" concerning a recall of eight models due to a "defect [that] exists in the accelerator pedal assembly which may result in the accelerator pedal becoming harder to depress, slower to return, or, in the worst case, mechanically stuck . . . ."   Toyota issued this Defect Report despite indicating that the percentage of vehicles estimated to experience malfunction was "unknown," meaning that Toyota felt the defect was so serious that a recall was required without waiting for the defect to manifest itself in each vehicle.

///

///

COMPLAINT FOR DAMAGES

181.   In a January 22, 2010 internal email, Toyota Canada admitted that due to the UA issues created by floor mats and gas pedals, there was "logic" in that a "brake over-ride would be effective in any failures to prevent accidents. TC wanted us to employ it as soon as possible."

182.   On or about January 26, 2010, Toyota announced in a press release issued from Torrance, California that it was voluntarily suspending sales of eight models involved in the January 21, 2010 recall for sticking accelerator pedals, including its top selling Camry and Corolla models. Group Vice President and Toyota Division General Manager Bob Carter made clear that "[t]his action is necessary until a remedy is finalized." Toyota further announced that due to the sales suspension, Toyota was expected to stop producing vehicles on several North American production lines. Toyota did not resume sales of these vehicles until February 5, 2010.

183.   Toyota was careful to make certain it would be difficult to discover what it knew about the UA defect, which models were affected and which managers were involved. Employees were instructed to disguise emails:

- When you send a mail to somebody outside the company, drop cc to your boss.[]

Check the subject/text/attachment(*)

*Any emails from Quality Control Department are basically "confidential."

- Put "Secret" and "Don't forward" in the beginning of every email (including reply and forward.) []

- Do not include both project code and car names. []

- Attached documents (prepared by your department or other department) should be classified. []

- When you reply to emails, generally delete the tracking record and attachment. [] masato_kosugi@mta.mx.toyota.co.jp on 1/26/2010

49

184.   While Toyota executives were claiming the defect was due to pedal entrapment, dealers believed otherwise:

> I'm afraid that many of us in the dealer body feel embarrassed and not a little ashamed regarding a perception that we may have been used to faithfully endorse the (apparently inaccurate) party line that the only customer concerns have been as a result of pedal entrapment. While I'm sure that this was never Toyota's intent, there is a palpable feeling somewhere between disappointment and betrayal at the retail level. As you know, this would be best addressed by a prompt, effective cure for customer concerns.  The other thought is that it was not the Watergate break-in that brought down President Nixon; it was the aftermath. Please help us with your endorsement that all communications be frank, complete, and 100% accurate.

185.   In 2010, TMC announced that it would install a brake- override system on an expanded range of customers' vehicles to provide an additional "measure of confidence." According to the announcement, this braking system enhancement will automatically reduce engine power when the brake pedal and the accelerator pedal are applied simultaneously under certain driving conditions.

186.   "Expansion of this brake override system underscores Toyota's commitment to building the safest and most reliable vehicles on the road, as we have for 50 years, and to ensuring that our customers have complete confidence in the vehicles they drive," said Jim Lentz, President and Chief Operating Officer of TMS. Lentz did not address why this commitment to quality did not result in a brake-override being installed as early as 2002 when UA complaints were received. Lentz did not explain why millions of other Toyota vehicles, such as the model year 2002-2006 Camrys, would not be eligible for the brake-override.

/ / /

187.   Importantly, the brake-override was not announced as a "Safety Recall." Rather, it was implemented to boost consumer "confidence." And the confidence booster is not being installed in all models with the UA defect, such as the 2002- 2006 Camrys.

188.   On March 2, 2010, TMC Executive Vice President, Takeshi Uchiyamada, Executive Vice President, submitted prepared testimony to the Senate Committee on Commerce, Science and Transportation. Mr. Uchiyamada's testimony purported that the ETCS-i system is tested "extensively both in the design phase and after it is developed to ensure that there is no possibility of 'sudden unintended acceleration.'" In reality, Toyota relies heavily upon its component suppliers to perform such testing. Toyota's suppliers typically complete Toyota's parts level testing independently. Toyota performance standards apply only to Tier 1 suppliers. Toyota does not have any clearly written rules or regulations about who must conform to Toyota's standards below its Tier 1 suppliers. For instance, while Toyota may impose testing standards on CTS, the supplier of the sticky accelerator pedals at issue, when questioned before Congress, Toyota engineers could not testify that Toyota imposed similar controls on the manufacturers of the sensors and circuit board that CTS utilizes in its pedal. Moreover, Toyota's engineers admitted that "there is no particular or special testing that would directly prove that there is no unintended acceleration."

189.   On March 5, 2010, Congressmen Henry A. Waxman and Bart T. Stupak, Chairmen of the House Subcommittee on Oversight and Investigation, wrote a letter to James E. Lentz, President and Chief Operations Officer of Toyota Motor Sales U.S.A., Inc., stating, among other things:

> We do not understand the basis for Toyota's repeated assertions that it is "confident" there are no electronic defects contributing to incidents of sudden acceleration.  We wrote you on February 2, 1010, to request "all analyses or documents that substantiate" Toyota's claim that electronic malfunctions are not causing sudden unintended acceleration. The documents that Toyota provided in response to this request did not provide

convincing substantiation. We explained our concerns about the failure of Toyota to substantiate its assertions in our letter to you in February 22, 2010.

After we sent our letter on February 22, Toyota provided a few additional documents to the Committee early in the morning on the day of the hearing. Several of these documents were written in Japanese. While some of these documents appear to contain preliminary fault analyses that could be used in planning a rigorous study of potential cause of sudden unintended acceleration, not one of them suggested that such a rigorous study had taken place. As we explained in our February 22 letter, the only document Toyota has provided to the Committee that claims to study the phenomenon of sudden unintended acceleration in a comprehensive way, is an interim report from the consulting firm Exponent, Inc. This report has serious deficiencies, as we explained in our February 22 letter.

190.   Toyota has continued to maintain that there are no problems with its ETCS-i in public and in depositions, but has provided little or no support for these statements. For example, when asked why Toyota believed there were no problems with the ETCS-i, its technical analysis manager testified falsely, "[t]his basis for those statements would be when we have been asked to investigate any customer concern involving unintended acceleration, we have never found anything related to the electric control system that could be the cause of those matters."

191.   Toyota's purported floor mat and sticky pedal "fixes" have not addressed the root cause of unintended acceleration.  Despite the flurry of media attention, NHTSA activity and congressional scrutiny, Toyota has still not adequately addressed the root cause of UA. While sticky pedals and floor mats likely did contribute to some UA incidents, Toyota used these issues as a smoke screen to hide the electronic defects in their vehicles. Toyota never made any significant changes to improve the acceleration system and the ETCS, despite the availability of safe and inexpensive alternative designs and feasible modifications. Rather, Toyota has repeatedly stated to consumers, the media, its dealers, and Congress, that its vehicles' electronic acceleration systems are not the cause of UA incidents.

COMPLAINT FOR DAMAGES

192.  Despite Toyota's public position, evidence continues to mount that the recalls focused on limited mechanical issues are inadequate to prevent UA, and that the vehicles' electronics cannot be ruled out as a likely cause of the incidents.

193.  As The New York Times reported on March 2, 2010, "an analysis of government documents shows that many Toyota Camrys built before 2007, which were not subject to recalls, have been linked to a comparable number of speed-control problems as recalled Camrys."  A study of Japan's government records revealed a similar finding.  As a result, the U.S. Department of Transportation has included pre-2007 Camrys in their broader investigation of the role that ETCS may be playing in these incidents.

194.  Further, affected vehicles that have been recalled and repaired continue to suffer UA incidents.  On March 4, 2010, just months after Toyota issued two independent recalls related to UA, NHTSA revealed that it had received over 60 UA complaints in Toyota vehicles that had been repaired pursuant to the recalls.  As The Los Angeles Times reported, the complaints included several crashes and at least three injuries.  On March 17, 2010, the Associated Press reported that the number of post-recall incidents had reached over 100.

195.  The Camry findings and the post-recall incidents greatly undermine Toyota's public position, and confirm that the ETCS is the likely source of UA.

196.  Indeed, Toyota admits that the recalls have not addressed the UA problem. When questioned before a Congressional panel, Toyota's top U.S. sales executive, James Lentz, admitted that Toyota could not rule out electronics problems, and that the two recalls would "not totally" solve the problem.  Among other potential causes, Mr. Lentz identified software problems, faulty cruise control, and engine revs caused by engaging the air conditioner.

197.  Additionally, numerous independent experts have spoken out in recent months to challenge Toyota's inexplicable confidence in its electronic systems.

///

COMPLAINT FOR DAMAGES

198.  For example, David M. Cummings, executive vice president of the Kelly Technology Group in Santa Barbara, California, has 30 years' experience in building computer systems embedded inside other devices, including nine years as a consultant for the Jet Propulsion Laboratory where he worked on the Mars Pathfinder spacecraft. In an opinion piece in The Los Angeles Times on March 12, 2010, Mr. Cummings dismissed Toyota's repeated statements that its electronics could not be faulted, and explained that there are "software bugs" that simply cannot be reproduced in a laboratory test environment.

199.  Toyota knows, or should know, that its electronics are not infallible. Indeed, software problems have arisen in other Toyota vehicles. On February 8, 2010, Toyota announced a voluntary safety recall on some of its models to update software in the vehicle's anti-lock brake system (ABS), in response to braking problems experienced by drivers. This recall involves approximately 133,000 Model Year 2010 Prius vehicles and 14,550 Model Year 2010 Lexus HS 250h vehicles.

200.  More generally, over the last two decades, various Toyota and Lexus vehicles have been recalled due to electronics and software defects that led to engine surging, engine racing, and unintended engagement of headlights and taillights, according to a Los Angeles Times, February 14, 2010 article. As far back as 2003, Toyota had to "recalibrate" the Electronic Control Modules in certain 2003 Camrys due to engine "surging."

201.  On March 3, 2010, Toyota produced a "Brake Override System" pamphlet demonstrating how their new vehicles are being manufactured with a safety system that will combat the effects of a defective electronic control throttle system. The pamphlet indicates that "the Brake Override System operates when the following conditions are met: 1. The throttle opening is greater than 1/3; 2. Vehicle speed is above 5 mph; and 3. Brakes are applied firmly." (*See* Exhibit 18).

/ / /

/ / /

COMPLAINT FOR DAMAGES

202.   Toyota continues today to maintain the position that the brake override system is being installed in its vehicles not as a safety measure, but only in order to provide "an extra measure of confidence" to its customers.  Indeed, Toyota utilizes this tag line as a means to evade the very important question of why Toyota has waited this long to install brake override systems in their vehicles, while other manufacturers have utilized similar technology to ensure the safety of their vehicles since 2001.   An example of this practice can be seen in a memo entitled   "Accelerator Pedal Entrapment 'Need to Know' for Toyota Associates:"

> Q7A: Other manufacturers use a system similar to the brake override system, why didn't Toyota?
>
> A7A: The brake override system is being introduced to provide an extra  measure of confidence to our customers. This system is being introduced for all Toyota vehicles globally starting in 2010 and will be standard equipment for all 2011 model year vehicles.

(*See* Exhibit 19, TOY-MDLID00056582)

203.   As another example, Masanori Hirose, an engineer from TMC who has been involved in the design and development of the brake override system, has testified that the brake override system is not being added as a failsafe system, but is "for extra confidence of our customers."   Mr. Hirose also admits, however, that the Bosch brake override system used in the 2001 Yaris, which is "more or less the same" as the Toyota brake override system, would have been able to detect a floor mat entrapping the pedal.

204.   Decedents and Plaintiffs were, at all times relevant, ignorant of the existence of the defects described herein and, knowing this, Toyota continued to broadly disseminate statements about the safety and reliability of its vehicles, while denying the existence of the defects.

/ / /

/ / /

COMPLAINT FOR DAMAGES

205. For example, on September 29, 2009, Toyota issued a press release entitled "Toyota Lexus Consumer Safety Advisory: Potential Floor Mat Interference with accelerator Pedal," stating in part:   "Toyota Motor Sales, USA, Inc. takes public safety very seriously.  It believes its vehicles to be among the safest on the road today."

206. Toyota's fraudulent concealment scheme includes, but is not limited to, intentionally covering up and refusing to publicly disclose critical internal memoranda, design plans, studies, Notices of Action, Problem Detail Reports and other reports of failure and injury.  Through such acts of fraudulent concealment, Toyota was able to actively conceal from the public for years the truth about the existence of the dangerously defective acceleration control and throttle system in its vehicles, thereby tolling the running of any applicable statute of limitations.  Plaintiff was and continues to be prevented from knowing and having knowledge of such unlawful, unfair, fraudulent, and deceptive conduct, or of facts that might have led to the discovery thereof.

207. Plaintiffs filed this lawsuit within two years of the subject incident, and within two years of first suspecting that defects in the Subject Vehicle were a cause of the death of Decedents.

208. Toyota is estopped from relying on any statutes of limitation because of its fraudulent concealment and misrepresentations of the true facts concerning the dangerously defective acceleration control and throttle system on its vehicles.  Toyota was, at all times relevant, aware of the nature and existence of the defects in its vehicles, but at all times has continued to manufacture, certify, market, advertise, distribute, and sell its vehicles without revealing the true facts concerning the defects, in order to sell Toyota and Lexus cars, to avoid bad publicity, and to avoid expensive recall processes.  The true facts about its vehicles continue to be concealed from the public, including Plaintiffs and Decedents.

/ / /

/ / /

COMPLAINT FOR DAMAGES

209.   Particularly given Toyota's past and continuing denials of, and concealment of, the existence of any defect in the acceleration control and throttle system, and Toyota's repeated past and continuing assertions that unintended acceleration episodes were due to other causes, Plaintiffs were not placed on inquiry notice regarding the Defects in the acceleration control and throttle system until, at the earliest, February, 2010.   It was in February, 2010 that Toyota stated publicly, in connection with Congressional hearings, that it does not, in fact, know the cause of the unintended acceleration problem in the majority of cases (contrary to its repeated past claims about floor mats, sticking pedals, etc.).   Toyota has continued to deny, and to conceal, that there is any flaw or defect in the acceleration control and throttle system itself. Toyota's April 19, 2010 agreement to pay NHTSA's $16.4 million fine constitutes an acknowledgement that Toyota engaged in a pattern and practice of concealing the true problems which resulted in unintended acceleration in its cars, the full extent of which will only become known through further governmental investigation and litigation.

210.   For these same reasons, Defendants are estopped from claiming that Plaintiffs did not secure, preserve, maintain and/or otherwise continue to make available the Subject Vehicle for inspection by Defendants.   Because Toyota actively and intentionally concealed the defects for years, Plaintiffs were never placed on notice that there was a need to preserve the Subject Vehicle.   Due to the accident and Toyota's pattern of concealment, Plaintiffs' ability to obtain evidentiary proof in the form of an intact, easily inspected vehicle has been rendered difficult, if not unattainable.

/ / /
/ / /
/ / /
/ / /
/ / /

COMPLAINT FOR DAMAGES

# VII.  FIRST CAUSE OF ACTION

## (Fraudulent Concealment)

211.  Plaintiffs incorporate by reference, as though fully set forth herein, each and every allegation and statement contained in the foregoing paragraphs.

212.  As alleged herein, Toyota knew, as early as 2001 that certain of the vehicles it designed, manufactured, marketed, distributed, sold or leased were defective in that these vehicles have an unreasonably dangerous propensity to suddenly accelerate and thereby injure the users of these vehicles and others.

213.  Toyota fraudulently concealed from and/or failed to disclose to Decedents and Plaintiffs the true defective nature of the Toyota Camry vehicle.

214.  At all times relevant, Toyota had exclusive and superior knowledge of the defects and concealed, suppressed and failed to disclose the true facts to Decedents and Plaintiffs who, at all times relevant, were ignorant and unaware of the existence and nature of the defects.  Toyota therefore had a duty to disclose the nature and existence of the defects before and after the Subject Vehicle was purchased.  Had Toyota disclosed the whole truth about the existence and nature of the defects, Decedent, Paul Van Alfen, and Plaintiff, Shirlene Van Alfen, would not have purchased the Subject Vehicle.

215.  As alleged herein, Toyota made repeated statements to Decedents and Plaintiffs, touting the safety and reliability of its vehicles.  An example, among many, some of which have already been exemplified herein, is the uniform written statements contained in the Toyota Warranty and a Maintenance Guides that accompanied the sale or lease of each of its vehicles.  They uniformly stated:

> At Toyota, our top priority is always our customers. We know
> your Toyota is an important part of your life and something you
> depend on every day. That's why we're dedicated to building
> **products of the highest quality and reliability**. . . Our goal is

58

for every Toyota customer to enjoy **outstanding quality, dependability and peace of mind** . . . (Emphasis added).

216. This statement was only partially true, and hardly at all with respect to uncontrolled acceleration. This partially true statement created a duty for Toyota to disclose the whole truth that, in fact, its vehicles were dangerously defective as a result of the sudden uncontrollable acceleration defects alleged herein.

217. Whether a vehicle contains a known defect that has resulted in crashes, deaths and injuries, is critically important information for consumers and families alike, when choosing to purchase or lease a vehicle. The omitted information, as alleged herein, was objectively material to both the decision as to whether to purchase the Subject Vehicle and whether to drive the Subject Vehicle on the day of the subject incident.

218. At all times relevant, the Toyota Defendants, and each of them, intentionally concealed and suppressed the nature and extent of the defects with the intent to defraud Decedents and Plaintiffs.

219. Decedents and Plaintiffs were at all times relevant, unaware and ignorant of the nature and existence of the defects in its vehicles.

220. At all times relevant, Toyota purposefully and intentionally devised its scheme of concealment and suppression of the true facts concerning the existence and nature of the defects. Plaintiffs are not asserting a claim based upon fraud on NHTSA or any federal agency, but rather, upon concealment and suppression of material facts from the public, including Decedents and Plaintiffs, and misrepresentations which were made to the public, including Decedents and Plaintiffs.

221. As a direct and proximate result of defects in the Subject Vehicle and the wrongful conduct, acts, omissions, and fraudulent misrepresentations of Toyota, Plaintiffs suffered the injuries and damages as alleged herein.

222. Plaintiffs are entitled to damages, including punitive damages, in an amount to be proven at trial, together with interest thereon and costs.

59

223.   WHEREFORE, Plaintiffs pray for judgment against the Toyota Defendants, and each of them, as hereinafter set forth.

## VIII.   SECOND CAUSE OF ACTION

### (Strict Products Liability – Design Defect)

224.   Plaintiffs incorporate by reference, as though fully set forth herein, each and every allegation and statement contained in the foregoing paragraphs.

225.   The Toyota Defendants, and each of them, designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or failed to inspect, repaired, retrofit or failed to retrofit, failed to recall, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled, and sold the subject vehicle and its component parts and constituents, which was intended by the Toyota Defendants, and each of them, to be used as a passenger vehicle and for other related activities.

226.   The Toyota Defendants, and each of them, knew that said vehicle was to be purchased and used without inspection for defects by Plaintiffs and Decedents and the general public.

227.   The subject Toyota vehicle was unsafe for its intended use by reason of defects in its design, testing, components and constituents, so that it would not safely serve its purpose, but would instead expose the users of said product to serious injuries.

228.   The Toyota Defendants designed the subject Toyota vehicle defectively, causing it to fail to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

229.   The risks inherent in the design of the subject Toyota vehicle outweigh significantly any benefits of such design.

230.   At the time of the subject incident, Plaintiffs and Decedents were using the Subject Vehicle in a reasonably foreseeable manner.

/ / /

/ / /

COMPLAINT FOR DAMAGES

231. As a legal and proximate result of the aforementioned defects of the Subject Vehicle, the subject incident occurred, Plaintiffs were harmed and Decedents suffered injury and died, and Plaintiffs sustained the injuries and damages set forth herein.

232. Plaintiffs are entitled to damages, including punitive damages, in an amount to be proven at trial, together with interest thereon and costs.

233. WHEREFORE, Plaintiffs pray for judgment against The Toyota Defendants, and each of them, as hereinafter set forth.

## IX.   THIRD CAUSE OF ACTION

### (Strict Products Liability - Failure to Warn)

234. Plaintiffs incorporate by reference, as though fully set forth herein, each and every allegation and statement contained in the foregoing paragraphs.

235. The Toyota Defendants, and each of them, knew that the Subject Vehicle, and its component parts, would be purchased and used without inspection for defects in the design of the vehicle.

236. The Subject Vehicle was defective when it left the control of each of the Toyota Defendants.

237. At the time of the Subject Vehicle's design, manufacture, and sale, and continuing up to the time of Decedents' deaths and Plaintiffs' injuries, Toyota knew or should have known of the substantial dangers involved in the reasonably foreseeable use of these vehicles, whose defective design, manufacturing, and lack of sufficient warnings caused them to have an unreasonably dangerous propensity to suffer from sudden unintended acceleration and thereby cause injuries.

238. Toyota knew that these substantial dangers are not readily recognizable to an ordinary consumer and that consumers would purchase and use these products without inspection.

/ / /

/ / /

239.  At all relevant times, Toyota failed to provide adequate warnings, instructions, guidelines or admonitions to members of the consuming public, including Decedents and Plaintiffs, of the defects, which Toyota knew, or in the exercise of reasonable care should have known, to have existed in the Subject Vehicle, and its component parts.

240.  At the time of Plaintiffs' injuries and Decedents' deaths, the Subject Vehicle was being used in the manner intended by Toyota and in a manner that was reasonably foreseeable by Toyota as involving substantial danger that was not readily apparent to its users.

241.  Plaintiffs' damages are the legal and proximate result of Toyota's failure to provide adequate warnings. Toyota owed Decedents and Plaintiffs a duty in designing, manufacturing, warning about, and distributing the Subject Vehicle.

242.  Plaintiffs are entitled to damages, including punitive damages, in an amount to be proven at trial, together with interest thereon and costs.

243.  WHEREFORE, Plaintiffs pray for judgment against the Toyota Defendants, and each of them, as hereinafter set forth.

## X.    FOURTH CAUSE OF ACTION

### (Negligence)

244.  Plaintiffs incorporate herein by reference, as though fully set forth at length, each and every allegation and statement contained in the foregoing paragraphs.

245.  At all times herein relevant, Defendants, and each of them, were and are engaged in the business of, including but not limited to, selling, designing, manufacturing, fabricating, distributing, retailing, wholesaling, recommending, testing, modifying, controlling, advertising, creating, processing, preparing, constructing, packaging, utilizing, providing, warranting, servicing, repairing, maintaining, marketing, leasing, renting, vending, installing, handling, labeling, promoting, advertising, furnishing, retailing, analyzing, inspecting, supplying warnings and placing into the stream of commerce the Subject Vehicle.

246. Defendants, including their employees, agents, directors, officers, stockholders, partners and associates, had a legal duty to conform their conduct in accordance with the law and that of a reasonable person, which includes adequately and properly managing and operating their business and their manufacturing, design, warning, distribution, and retail operations; adequately and properly training and supervising their employees and agents, including their designers, inspectors, quality control agents and other manufacturing, testing, distribution and delivery personnel; properly designing, manufacturing, warning, inspecting, servicing, and distributing the Subject Vehicle; and acting without negligence, conscious disregard, despicable or other wrongful conduct.

247. Defendants, including their employees, agents, directors, officers, stockholders, partners and associates knew or should have known that the Subject Vehicle was defectively designed and inherently dangerous and has a propensity to suddenly accelerate, lose control, and cause injuries and/or deaths.

248. Defendants, including their employees, agents, directors, officers, stockholders, partners and associates knew or should have known that the Subject Vehicle was defectively designed and/or manufactured and was therefore prone to failure under normal driving conditions, potentially causing injuries and/or deaths.

249. Defendants, including their employees, agents, directors, officers, stockholders, partners and associates, failed to exercise ordinary care and breached their duty by, among other things:

     a.    Failure to use due care in the manufacture, distribution, design, sale, testing, and servicing of the Subject Vehicle and its component parts in order to avoid the aforementioned risks to individuals;

     b.    Failure to provide adequate warning of the UA problem and its propensity to cause and/or contribute to an accident;

/ / /
/ / /

63

COMPLAINT FOR DAMAGES

c.     Failure to incorporate within the vehicle and its design reasonable safeguards and protections against sudden acceleration and the consequences thereof;

d.     Failure to make timely correction to the design of the Subject Vehicle to correct the sudden acceleration problems, including the failure to install and provide a proper brake override system;

e.     Failure to adequately identify and mitigate the hazards associated with UA in accordance with good engineering practices; and

f.     Were otherwise careless or negligent.

250.   As a direct and proximate result of the negligent acts and/or omissions of the Toyota Defendants and the Dealer Defendant, Decedents suffered injury and died, and Plaintiffs suffered the injuries and damages alleged herein.  Plaintiffs Plaintiffs Shirlene Van Alfen and Cameron Van Alfen were harmed, and Defendants' breach of their duties was the cause of the harm suffered by Plaintiffs Shirlene Van Alfen and Cameron Van Alfen.

251.   Plaintiffs are entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

252.   WHEREFORE, Plaintiffs pray for judgment against the Toyota Defendants and the Dealer Defendant, and each of them, as hereinafter set forth.

## XI.   FIFTH CAUSE OF ACTION

### (Breach of Express Warranty and Implied Warranty of Merchantability)

253.   Plaintiffs incorporate herein by reference, as though fully set forth at length, each and every allegation and statement contained in the foregoing paragraphs.

254.   Prior to the time of the subject incident, the Toyota Defendants expressly and impliedly warranted to members of the general public, including Plaintiffs and Decedents, that the Subject Vehicle was safe and of merchantable quality.

255.   Members of the consuming public, including consumers such as Plaintiffs and Decedents, were express and intended third-party beneficiaries of the implied

warranty of merchantability.  The Van Alfens were the registered owners of the subject Toyota Camry vehicle.

256.  Plaintiffs and Decedents relied on the skill and judgment of the Toyota Defendants in the selection, purchase, maintenance, and use of the Subject Vehicle as a safe and reliable means for transportation. The Subject Vehicle was not of merchantable quality as warranted by the Toyota Defendants, in that it was defectively designed, thereby dangerously exposing the users of said vehicle and those around it to serious injury.

257.  Rather, it had at multiple design defects, including inadequate fault detection systems, components that were susceptible to malfunction, such as short circuits, software glitches, and electromagnetic interference, and lacked a proper brake override system.

258.  After Plaintiffs received the injuries complained of herein, notice is given by Plaintiffs to the Toyota Defendants, by filing this lawsuit in the time and in the manner and in the form prescribed by law, of the breach of said warranty.

259.  As a legal and proximate result of the breach of said express and implied warranty, Plaintiffs sustained the damages herein set forth.

260.  Plaintiffs are entitled to damages in an amount to be proven at trial, together with interest thereon and costs.

261.  WHEREFORE, Plaintiffs pray for judgment against the Toyota Defendants, and each of them, as hereinafter set forth.

## XII.  SIXTH CAUSE OF ACTION

### (Magnuson Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*)

262.  Plaintiffs incorporate herein by reference, as though fully set forth at length, each and every allegation and statement contained in the foregoing paragraphs.

263.  This Court has original jurisdiction in this action and over the Toyota Defendants and the Dealer Defendant to decide claims brought under 15 U.S.C. §

2301, *et seq.* by virtue of 15 U.S.C. § 2310(d), and supplemental jurisdiction over the Dealer Defendant pursuant to 28 U.S.C. § 1367.

264.  Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

265.  TMS resides in this judicial District and operates as the U.S.-based arm of TMC. There is a combined liability between all of the Defendants such that venue is proper in this judicial District. Furthermore, the vehicle was distributed through California, and a substantial part of the warranties underlying Plaintiffs' claims were made, disseminated and originated from within this District, including the advertisements, representations and warranties of the Torrance-based TMS.

266.  The Toyota Defendants are a "suppliers" and "warrantors," and the Dealer Defendant serviced, maintained and repaired, all within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301.

267.  The Subject Camry is a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

268.  15 U.S.C. § 2310(d) provides a cause of action for any consumer who is damaged by the failure of warranty, service, repair, and maintenance. Defendants' actions are covered under the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7)-(8). For example, 15 U.S.C. § 2301(8) specifically provides that services, warranties and repairs are within the scope of the Magnuson-Moss Warranty Act. *See* 15 U.S.C. § 2301(8) ("The term "service contract" means a contract in writing to perform, over a fixed period of time or for a specified duration, services relating to the maintenance or repair (or both) of a consumer product.").

269.  The Subject Camry vehicle was not of merchantable quality and was not repaired, serviced, and/or maintained in the manner required under 15 U.S.C. § 2301.

270.  Privity is not required because Decedents/Plaintiffs are intended third-party beneficiaries under all the various contracts between Toyota, the Dealer Defendant and the Van Alfens.

COMPLAINT FOR DAMAGES

1    271.   As a result of Defendants' breach herein, Plaintiffs suffered injuries and/or

2    damages.

3    272.   The amount in controversy of Plaintiffs' individual claims meets or

4    exceeds the jurisdictional amounts.   The amount in controversy of this action exceeds

5    the sum of $50,000, exclusive of interest and costs.

## XIII.  SEVENTH CAUSE OF ACTION

### (Negligent Infliction of Emotional Distress)

8    273.   Plaintiffs incorporate herein by reference, as though fully set forth at

9    length, each and every allegation and statement contained in the foregoing paragraphs.

10   274.   Plaintiffs Shirlene Van Alfen and Cameron Van Alfen are direct victims of

11   Defendants' negligence and wrongful conduct, as alleged herein, in that they were

12   present and sustained personal injuries in the subject accident.

13   275.   Plaintiffs Shirlene Van Alfen and Cameron Van Alfen witnessed and

14   perceived their own injuries, as well as the death of Decedent Paul Van Alfen at the

15   scene of the accident (the father of Plaintiff Cameron Van Alfen and husband of

16   Plaintiff Shirlene Van Alfen).

17   276.   Plaintiffs Shirlene Van Alfen and Cameron Van Alfen have suffered

18   emotional distress caused by Defendants' negligence.

19   277.   At all times herein alleged, Defendants should have realized that their

20   conduct involved an unreasonable risk of causing the distress and harm alleged herein

21   and that Plaintiffs have suffered, and from the facts known to them, should have

22   realized that the distress, if it were caused, might result in illness or bodily harm.

## XIV.  EIGHTH CAUSE OF ACTION

### (Wrongful Death)

25   278.   Plaintiffs incorporate herein by reference, as though fully set forth at

26   length, each and every allegation and statement contained in the foregoing paragraphs.

27   ///

28   ///

67

279.  As alleged herein, Decedents Paul Van Alfen and Charlene Lloyd died as a result of the concealment, defects, negligence, statutory violations, and wrongful conduct of Defendants.

280.  Plaintiffs are the heirs of Decedents and have been harmed and suffered damages.

281.  Plaintiffs seek general and special damages in connection with the loss of financial support, loss of gifts and benefits, loss of services, pain, suffering, mental and physical anguish, loss of care, comfort, protection, protection, companionship, society, society, advice, and friendship, recovery for grief, mental anguish, emotional pain, suffering and distress, medical, funeral and burial expenses; loss of lifetime earnings of Decedents, as well as punitive damages and all other damages permitted by law, to be proven at time of trial.

## XV.   NINTH CAUSE OF ACTION

### (Survival)

282.  Plaintiffs incorporate herein by reference, as though fully set forth at length, each and every allegation and statement contained in the foregoing paragraphs.

283.  On or about November 5, 2010, as a result of Defendants' actions, negligence, and failure to comply with the applicable standard of care, Decedent Paul Van Alfen suffered fatal injuries.

284.  Decedent Charlene Lloyd died on November 6, 2010 as a result of the injuries that she sustained in the incident as a result of Defendants' actions, negligence, and failure to comply with the applicable standard of care.

285.  Decedents suffered damages of a personal and pecuniary nature prior to their deaths, including but not limited to personal property damage, personal injury, conscious physical and mental pain and suffering, disability and disfigurement, as well as medical expenses and loss of earnings.  Had Decedents survived, they would have had the right to bring an action for their damages, and as such their right of action has

survived their deaths. The relationships of Plaintiffs to the Decedents and the damages claimed for wrongful death and survivorship are as follows:

a.     The estates of Decedents Paul Van Alfen and Charlene Lloyd suffered a loss of net accumulations, and their estates incurred funeral expenses.

b.     Mark Roundy, the brother of Decedent Charlene Lloyd, as personal representative of the estate claims the following damages arising from the death of Charlene Lloyd: loss of financial support; loss of services; the pain, suffering, mental and physical anguish and agony suffered by Decedent prior to her death; loss of care, comfort, protection, protection, companionship, society, society, advice, and friendship, recovery for grief, mental anguish, emotional pain, suffering and distress; medical, funeral and burial expenses; loss of lifetime earnings of Decedent, punitive damages and all other damages permitted by law, to be proven at time of trial.

c.     Plaintiff Charley Alton Jones, the father of Decedent Charlene Lloyd, as survivor claims the following damages arising from the death of Charlene Lloyd: loss of financial support; loss of services; the pain, suffering, mental and physical anguish and agony suffered by Decedent prior to her death; loss of care, comfort, protection, protection, companionship, society, society, advice, and friendship, recovery for grief, mental anguish, emotional pain, suffering and distress; medical, funeral and burial expenses; loss of lifetime earnings of Decedent, punitive damages and all other damages permitted by law, to be proven at time of trial.

d.     Plaintiff Sandra Jolene Jones, the mother of Decedent Charlene Lloyd, as survivor claims the following damages arising from the death of Charlene Lloyd: loss of financial support; loss of services; the pain, suffering, mental and physical anguish and agony suffered by Decedent prior to her death; loss of care, comfort, protection, protection, companionship, society, society, advice, and friendship, recovery for grief, mental anguish, emotional pain, suffering and distress; medical, funeral and burial expenses; loss of lifetime earnings of Decedent Charlene

COMPLAINT FOR DAMAGES

1  Lloyd, punitive damages and all other damages permitted by law, to be proven at time
2  of trial.

3          e.    Plaintiff MaKenna Lloyd, the daughter of Decedent Charlene Lloyd,
4  as survivor claims the following damages arising from the death of Charlene Lloyd:
5  loss of financial support; loss of services; the pain, suffering, mental and physical
6  anguish and agony suffered by Decedent prior to her death; loss of care, comfort,
7  protection, protection, companionship, society, society, advice, and friendship,
8  recovery for grief, mental anguish, emotional pain, suffering and distress; medical,
9  funeral and burial expenses; loss of lifetime earnings of Decedent Charlene Lloyd,
10  punitive damages and all other damages permitted by law, to be proven at time of trial.

11          f.    Plaintiff Shirlene Van Alfen, the spouse of Decedent Paul Van
12  Alfen, hereby claims the following damages arising from the death of Paul Van Alfen:
13  loss of financial support; loss of services; the pain, suffering, mental and physical
14  anguish and agony suffered by Decedent prior to her death; loss of care, comfort,
15  protection, protection, companionship, society, society, advice, and friendship,
16  recovery for grief, mental anguish, emotional pain, suffering and distress; medical,
17  funeral and burial expenses; loss of lifetime earnings of Decedent, punitive damages
18  and all other damages permitted by law, to be proven at time of trial.

19          g.    Plaintiffs Travis Van Alfen, Cameron Van Alfen, and Casey Van
20  Alfen, the sons of Decedent Paul Van Alfen, as survivors claims the following
21  damages arising from the death of Paul Van Alfen: loss of financial support; loss of
22  services; the pain, suffering, mental and physical anguish and agony suffered by
23  Decedent prior to his death; loss of care, comfort, protection, protection,
24  companionship, society, society, advice, and friendship, recovery for grief, mental
25  anguish, emotional pain, suffering and distress; medical, funeral and burial expenses;
26  loss of lifetime earnings of Decedent, punitive damages and all other damages
27  permitted by law, to be proven at time of trial.
28  ///

COMPLAINT FOR DAMAGES

286. The acts, conduct, and omissions of the Toyota Defendants, and each of them, as alleged throughout this Complaint were fraudulent, oppressive, willful and malicious and were done with a conscious disregard for the rights of Decedents and Plaintiffs and other users of the Defendants' products and for the primary purpose of increasing Defendants' profits from the sale and distribution of the subject Toyota Camry or other Toyota vehicles.   The Toyota Defendants' outrageous and unconscionable conduct warrants an award of punitive damages against each Defendant in an amount appropriate to punish and make an example of each Defendant.

287. Prior to the manufacturing, sale and distribution of the subject Toyota Camry, the Toyota Defendants and each of them knew that said product was in a defective condition as previously described herein and knew that those who used the product would experience and did experience severe physical, mental, and emotional injuries.   Further, the Toyota Defendants and each of them through their officers, directors, managers, and agents, had knowledge that the product presented a substantial and unreasonable risk of harm to the public, including plaintiff and as such, consumers of the product were unreasonably subjected to risk of injury or death from use of the product.

288. Despite such knowledge, defendants, and each of them, acting through their officers, directors and managing agents for the purpose of enhancing the Toyota Defendant's profits, knowingly and deliberately failed to remedy the known defects in the product and failed to warn the public, including plaintiff and the decedent, of the extreme risk of injury occasioned by said defects inherent in the product.   Said Defendants and their individual agents, officers, and directors intentionally proceeded with the manufacturing, sale, and distribution and marketing of the product knowing persons would be exposed to serious danger in order to advance Toyota's own pecuniary interest and monetary profits.

/ / /

71

289. The Toyota Defendants' conduct was fraudulent, despicable, and so contemptible that it would be looked down upon and despised by ordinary decent people, and was carried on by Toyota with willful and conscious disregard for the safety of Plaintiff and Decedents, entitling Plaintiffs to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against all Defendants, as follows:

1. Past and future general damages, in an amount which will conform to proof at time of trial;

2. Past and future economic and special damages according to proof at the time of trial;

3. Loss of earnings and impaired earning capacity according to proof at the time of trial;

4. Medical and related care expenses, past and future, according to proof at the time of trial;

5. Punitive or exemplary damages according to proof at the time of trial;

6. For costs of suit incurred herein;

7. For pre-judgment interest as provided by law; and

8. For such other and further relief as the Court may deem just and proper.

Dated: May 13, 2011            THE SPENCE LAW FIRM

                               By: _____
                                   ROBERT A. KRAUSE

Dated: May 13, 2011            ROBINSON, CALCAGNIE & ROBINSON

                               By: _____
                                   MARK P. ROBINSON, JR.

                               *Attorneys for Plaintiffs*

72

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a jury trial as provided by Federal Rule of Civil Procedure 38.

Dated: May 13, 2011                    THE SPENCE LAW FIRM

By: _____

ROBERT A. KRAUSE


Dated: May 13, 2011                    ROBINSON, CALCAGNIE & ROBINSON

By: _____

MARK P. ROBINSON, JR.

*Attorneys for Plaintiffs*

COMPLAINT FOR DAMAGES

# EXHIBITS

| | |
|---|---|
| Exhibit 1 | Page 75 |
| Exhibit 2 | Page 80 |
| Exhibit 3 | Page 83 |
| Exhibit 4 | Page 92 |
| Exhibit 5 | Page 94 |
| Exhibit 6 | Page 97 |
| Exhibit 7 | Page 100 |
| Exhibit 8 | Page 102 |
| Exhibit 9 | Page 109 |
| Exhibit 10 | Page 111 |
| Exhibit 11 | Page 114 |
| Exhibit 12 | Page 119 |
| Exhibit 13 | Page 129 |
| Exhibit 14 | Page 131 |
| Exhibit 15 | Page 138 |
| Exhibit 16 | Page 141 |
| Exhibit 17 | Page 146 |
| Exhibit 18 | Page 150 |
| Exhibit 19 | Page 153 |